**HOLM, Appellant,**

v.

**SMILOWITZ, Appellee.**

[Cite as *Holm v. Smilowitz* (1992), 83 Ohio App.3d 757.]

Court of Appeals of Ohio,
Athens County.

No. 1520.

Decided Nov. 16, 1992.

760

*Schottenstein, Zox & Dunn Co., L.P.A.,* and *Bridgette C. Roman; Friedman & Babbitt* and *Gerald J. Babbitt,* for appellant.

*Eslocker, Grim, Hodson & Diogardi* and *Thomas E. Eslocker,* for appellee.

STEPHENSON, Presiding Judge.

This is an appeal from a judgment entered by the Athens County Court of Common Pleas which, among other things, designated Michael Smilowitz, defendant below and appellee herein, as the residential parent for his daughter, Margaret Jean Holm Smilowitz, a.k.a. Meg (d.o.b. March 9, 1988) (hereinafter referred to as the "minor child"), and provided visitation and child support orders for the mother, Margaret Holm, plaintiff below and appellant herein. Appellant assigns the following errors for our review[1]:

I. "The lower court lacked subject matter jurisdiction to entertain Appellee's motion to change custody."

II. "The time limitation of one and one-half hours imposed by the lower court was an abuse of discretion."

III. "The lower court's order modifying custody is contrary to the manifest weight of the evidence."

IV. "The lower court's contempt citation is jurisdictionally deficient and is contrary to the weight of the evidence."

V. "The lower court's visitation order is predicated upon inadmissible evidence and is not in the minor child's best interest."

This case involves an acerbic and convoluted custody battle between the parties herein. Although the pleadings are numerous and the proceedings below complex, a summary of the facts pertinent to this particular appeal is as follows. The parties were divorced in 1989. Custody of the minor child was awarded to appellant and appellee was ordered to pay child support and was allotted one

---

1. Appellant's brief fails to include a "statement" of the assignments of error presented for review as required by App.R. 16(A) and, therefore, we take these from scattered arguments therein.

week of visitation per month. Just prior to the conclusion of the original divorce proceedings, appellee left Ohio to accept a teaching position at the University of North Carolina.[2] As evidenced by the number of contempt motions appearing of record after the final divorce judgment, there have been difficulties between the parties in complying with the visitation and support orders.

On September 5, 1990, appellant filed a motion requesting that the one-week visitation with the minor child in North Carolina be terminated and that appellee be required to travel to Athens, Ohio, to visit with his daughter. On November 6, 1990, appellee filed a motion requesting that custody of the minor child be transferred to him on the grounds that appellant had "carried out a pattern of behavior intended to interfere with or obstruct [his] visitation rights."[3]

Less than three months after appellee filed his motion for custody modification, appellant took the minor child and moved back to her home state of Utah. Appellee was thereafter denied monthly visitations by appellant for March, April and May of that year.[4] Although appellee was permitted to spend several weeks with the minor child in June 1991, he was denied court-ordered visitation that was to occur during the following July and August. On August 19, 1991, appellee obtained an interim custody order pursuant to Civ.R. 53(E) granting him immediate temporary custody of the minor child.[5] With the assistance of several Utah police officers, appellee thereafter regained physical possession of his daughter.

Appellant then filed a motion below requesting that the interim custody order be vacated and that all previous motions filed by appellee be dismissed for want of subject matter jurisdiction. In support of her motion, appellant argued that

2. See *Holm v. Smilowitz* (July 25, 1990), Athens App. No. 1428, unreported, 1990 WL 105692, for additional information on the earlier proceedings in this case.

3. On June 27, 1991, appellee filed a similar motion to modify the prior "order allocating parental rights." This was presumably in response to a judgment entered the previous day that found that the parties failed to comply with the service requirements of Civ.R. 75(I) and that "the court was without [personal] jurisdiction to proceed." The new title of the motion brought it into conformity with the change in vernacular of R.C. 3109.04 from "custody" to "parental rights." See Am.Sub.S.B. No. 3 (143 Ohio Laws, Part I, 53, 111–126). The record does not reveal that appellant ever renewed her motion to terminate visitation.

4. Appellant offered various explanations for unilaterally terminating the North Carolina visitation ranging from financial hardship to her belief that the Utah state courts would thereafter take control of the matter. Later, at the hearing below, appellant claimed that she had offered to allow appellee to visit his daughter if he came to Utah. Appellee denied ever having been given such an opportunity to visit the minor child.

5. Inasmuch as such orders may not extend more than twenty-eight days from their date of entry, see Civ.R. 53(E)(7), the court below entered additional judgments extending the order on September 16, October 15, November 12 and December 11, 1991.

Ohio law is preempted by federal provisions enacted as the Parental Kidnapping Prevention Act (hereinafter referred to as "PKPA") and codified at Section 1738A(d), Title 28, U.S.Code, which Act indicates that a state court loses jurisdiction to determine child custody matters when said state is no longer the residence of the child or of either contestant in a custody action. Given that appellee is a resident of North Carolina, and considering that the minor child had been moved to Utah, appellant reasoned that Ohio had lost jurisdiction and that her daughter should be immediately returned to her custody.

Appellee filed his memorandum contra motion to dismiss and argued that the provisions of the PKPA were not controlling in the cause *sub judice* because there was no dispute between Utah and Ohio as to which state would assume jurisdiction over the matter. In support of this argument, appellee attached a copy of a judgment entered by the Fifth Judicial District Court for Iron County, Utah, which declared, *inter alia,* "[t]hat the Utah court declined to exercise jurisdiction after consultation with the Athens County, Ohio Court." The Utah court further declared that "original and continuing jurisdiction remains in Athens, Ohio." [6]

The matter was referred to the court referee who issued her report on October 8, 1991, recommending that the motion to dismiss be denied. In so doing, the referee opined that the PKPA was not designed to wrest jurisdiction from state courts under these sorts of circumstances. Although appellant filed objections to the report, they were overruled and the trial court entered judgment adopting the report and denying the motion to dismiss.

On October 11, 1991, the referee conducted a hearing on a number of pending motions, including those for contempt, termination of visitation and change of custody. The referee issued her report on November 12, 1991, recommending, among other things, that appellee be designated as the new residential parent and legal custodian for the minor child and that appellant be found in contempt of court for "willful denial" of visitation rights. On January 16, 1992, the trial court entered judgment overruling objections to that report and adopted its recommendation. This appeal followed.[7]

---

6. The record also contains a copy of correspondence between the court below and the Utah court, which further confirms that state's deference to Ohio's exercise of jurisdiction in the matter.

7. Appellant's notice of appeal states that her appeal is being taken from two orders entered by the trial court on January 8 and 16, *1991.* Presumably, this is a typographical error and appellant means to appeal the *1992* judgments. That being said, we note that the judgment of January 8 overruling the motion to dismiss was not a final appealable order pursuant to R.C. 2505.02. See Whiteside, Ohio Appellate Practice (1987) 29, Section T 5.19. This sort of interlocutory order is not independently appealable. *Freeman v. Holzer Med. Ctr.* (Mar. 30,

■ In the first assignment of error, appellant renews her argument that the lower court was without subject matter jurisdiction to entertain the motion(s) to change custody/modify allocation of parental rights. The resolution of this issue requires us to analyze the interplay between the federal provisions of the PKPA and the Ohio version of the Uniform Child Custody Jurisdiction Act ("UCCJA") enacted by the General Assembly in 1977. See Am.S.B. No. 135, 137 Ohio Laws, Part I, 359 (codified at R.C. 3109.21 to 3109.37). This would appear to be a novel issue in Ohio jurisprudence as neither party has cited a case which has previously considered it and we are not aware of any. Nevertheless, for the reasons that follow, we hold that the trial court properly found that it had subject matter jurisdiction over this case.[8]

■ It is well-settled law that the court which renders a decree of divorce retains continuing jurisdiction over matters relating to the custody of the parties' minor children. *Loetz v. Loetz* (1980), 63 Ohio St.2d 1, 2, 17 O.O.3d 1, 2, 406 N.E.2d 1093, 1093; *Van Divort v. Van Divort* (1956), 165 Ohio St. 141, 59 O.O. 207, 134 N.E.2d 715, at paragraph one of the syllabus. The court below, having been the original forum which entered the divorce decree between the parties and awarded custody of the minor child to appellant, would therefore have retained continuing jurisdiction over the matter. Such jurisdiction is significantly affected when the parties begin moving outside the state, thereby triggering Ohio's version of the UCCJA. In that event, a court with continuing jurisdiction is required by R.C. 3109.22(A) to refrain from exercising jurisdiction unless certain statutory requirements are met.[9]

---

1992), Gallia App. No. 91CA8, unreported, at fn. 1, 1992 WL 79583, appeal dismissed (1993), 66 Ohio St.3d 601, 613 N.E.2d 1037. Nevertheless, while that order cannot be made the foundation for an independent appeal, it may properly be reviewed for error prosecuted to the final judgment entered on January 16, see *Snell v. Cincinnati St. Ry. Co.* (1899), 60 Ohio St. 256, 272, 54 N.E. 270, 272, and therefore the issue is properly before us.

8. In a footnote to her first assignment of error, appellant also argues that the lower court lacked personal jurisdiction over her in this matter. A court of appeals is required to determine an appeal only on the basis of "the *assignments of error* set forth in the briefs." (Emphasis added.) App.R. 12(A)(1)(b). Appellant does not specifically assign as error the lack of personal jurisdiction below and, therefore, we do not reach the issue. Even if we were to consider the issue, we would reject it for the same reasons set out *infra* in our analysis of the fourth assignment of error.

9. These requirements include, among others, the following:
 "(1) This state is the home state of the child at the time of commencement of the proceeding * * *;
 " * * *
 "(4) It appears that * * * a court in another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to make a parenting determination relative to the child, and it is in the best interest of the child that this court assume jurisdiction." (R.C. 3109.22[A].)

Appellant contends that even if continuing jurisdiction is proper under the UCCJA, its exercise may still be precluded by the following portion of the PKPA codified at Section 1738A(d), Title 28, U.S.Code:

"The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such *State remains the residence of the child or of any contestant.*" (Emphasis added.)

As previously discussed, appellant and the minor child moved to Utah in February 1991. Appellant reasons that Ohio was no longer the residence of any party involved in the custody battle after such move and, therefore, the court below lost jurisdiction to consider the matter pursuant to the PKPA. In that federal law will control over state regulation on the same subject, appellant concludes that the UCCJA has been preempted by the PKPA and the trial court should have dismissed the proceedings for lack of jurisdiction. The referee below rejected this argument and, relying on several federal cases construing the PKPA, opined that the federal statute was inapplicable and controlled only when there was a dispute between several states as to which forum would assert jurisdiction. Inasmuch as there was no dispute between Utah and Ohio, the referee concluded that the statute did not control in the cause *sub judice.* The trial court apparently accepted this interpretation and declined to dismiss the proceedings. On appeal, appellant argues that the PKPA controls regardless of the absence of conflict between the states. We disagree.

The federal preemption doctrine is based on the Supremacy Clause of Article VI, United States Constitution, and holds that any state law must yield if it interferes with, or is contrary to, federal law. See, generally, *Fid. Fed. S. & L. Assn. v. de la Cuesta* (1982), 458 U.S. 141, 152, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 674; *Free v. Bland* (1962), 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180, 182. Be that as it may, state law is a nullity only to the extent of actual conflict with federal law and such a conflict is determined when, under the particular facts and circumstances of the case, such state law "stands as an obstacle to the accomplishment and execution of the full purpose and objective of Congress." *Ray v. Atlantic Richfield Co.* (1978), 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179, 188; *Jones v. Rath Packing Co.* (1977), 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604, 614; *Hines v. Davidowitz* (1941), 312 U.S. 52,

---

The court below did not specify which of these requirements it found to have been met in order to exercise jurisdiction. However, appellant offers no argument that the exercise of jurisdiction was erroneous under R.C. 3109.22(A) and there is nothing immediately apparent to us from the record which would indicate that it was improper. We therefore do not address the issue.

67, 61 S.Ct. 399, 404, 85 L.Ed. 581, 587. With this standard in mind, we turn our attention to ascertaining whether the court's exercise of jurisdiction below conflicted with the "full purpose and objective of Congress" in enacting the PKPA.

Both the UCCJA and the PKPA were legislative responses to problems with "interstate child snatching" by parents seeking a favorable custody award in the forum of their choice thereby leading to "jurisdictional deadlocks" among the states and a "national epidemic of parental kidnapping." Annotation (1991), 83 A.L.R.4th 742, 747–748, Section 2; Annotation (1990), 78 A.L.R.4th 1028, 1034, Section 2. The UCCJA was the first attempt at a comprehensive response to this problem and was meant, in part, to promote cooperation between the states and avoid jurisdictional competition and conflict between state courts in child custody matters. See Sections 1(a)(1) and (2) of the Uniform Act in 9 Uniform Laws Annotated, Part I (1988) 123–124. However, a number of states adopted differing versions of the Act or gave varying interpretations of its requirements. Krauskopf, Remedies for Parental Kidnapping in Federal Court: A Comment Applying the Parental Kidnapping Prevention Act in Support of Judge Edwards (1984), 45 Ohio St.L.J. 429, 434. This led to the rise of concurrent jurisdiction in several states which, in turn, engendered further state conflict and encouraged forum shopping. *Id.*; see, also, *Atkins v. Atkins* (1992), 308 Ark. 1, 5, 823 S.W.2d 816, 819. The PKPA emerged as a congressional attempt to offer a final resolution of this problem.

The principal problem Congress sought to remedy in passing this legislation was the inapplicability of full faith and credit requirements to state custody determinations. *Thompson v. Thompson* (1988), 484 U.S. 174, 181, 108 S.Ct. 513, 517, 98 L.Ed.2d 512, 521. In order to remedy this problem, supporters and sponsors of the PKPA sought to provide for nationwide enforcement of custody orders made in accordance with terms of the UCCJA. *Id.* They argued that the added force of federal law would fill gaps left by recalcitrant legislators who had either not adopted the UCCJA or had adopted it with significant variations from the uniform version. Atwood, Child Custody Jurisdiction and Territoriality (1991), 52 Ohio St.L.J. 369, at fn. 1 (citing joint Senate subcommittee hearings on the bill). The very purpose of the Act was to include the promotion of interstate cooperation, interstate enforcement of custody decrees and the avoidance of jurisdictional competition and conflict. *Id.* at 391. In ultimately passing the legislation, Congress issued a "mandate directed to state courts to *respect the custody decrees of sister [s]tates.*" (Emphasis added.) *Thompson, supra,* at 183, 108 S.Ct. at 518, 98 L.Ed.2d at 522.

██ Given its legislative history, a number of courts have construed the PKPA as being intended. to prevent jurisdictional conflicts and competition between states over child custody and in particular to deter parents from abducting children for purposes of obtaining custody awards. See, *e.g., Rees v. Reyes* (D.C.App.1992), 602 A.2d 1137, 1140; *Peterson v. Peterson* (Me.1983), 464 A.2d 202, 204; see, also, *Thompson v. Sundholm* (S.D.Tex.1989), 726 F.Supp. 147, 148 (the PKPA was created to relieve jurisdictional deadlocks among the states in child custody cases). Thus, violations of the PKPA are thought not to arise until there are two different states entering conflicting custody decrees. *Hooks v. Hooks* (C.A.6, 1985), 771 F.2d 935, 951; see, also, *Shores v. Shores* (E.D.Tenn. 1987), 670 F.Supp. 774, 776. This analysis is most persuasive in light of the aforementioned legislative history and evidence of congressional intent in passing the legislation.

██ There is no jurisdictional conflict whatsoever in the cause *sub judice,* as the Utah courts declined jurisdiction and agreed that Ohio would be .the more appropriate forum to decide this matter. The objective of the PKPA to provide interstate cooperation in resolving child custody disputes has been met and the "full purpose and objective of Congress" in enacting the legislation has neither been violated nor obstructed. We therefore hold that R.C. 3109.22(A) is not preempted by the PKPA in those instances where an Ohio court assumes jurisdiction over a child custody case pursuant to law and in agreement with any sister state having potentially competing jurisdictional claims.

Appellant cites nothing by way of legislative history which would support her preemption argument under these circumstances. Rather, we are referred to a number of cases giving a general discussion of preemption and the PKPA. For the most part, these cases are consistent with our holding herein as they involve interstate jurisdictional conflicts. See, *e.g., Olivia H. v. John H.* (Fam.Ct.1986), 130 Misc.2d 756, 759, 497 N.Y.S.2d 838, 841 (New York and California both claim jurisdiction); *Enslein v. Enslein* (1985), 112 A.D.2d 973, 974, 492 N.Y.S.2d 785, 786 (New York and Florida both claim jurisdiction). We agree that if Utah had asserted jurisdiction over this matter, then the PKPA. would have required that we extend full faith and credit to that judgment. This, however, was not the case.[10]

---

**10.** Similarly, the trial court noted in its entry of January 8, 1992, that if the "Utah authorities" had concluded that the jurisdictional requirements had been met, then the lower court "would have recognized the jurisdiction of the state of Utah and these proceedings would be occurring in that [s]tate." It may be that the court in Utah erred by not assuming jurisdiction over this case. However, the fact remains that it did not. Under these conditions, the court below properly acted to assume jurisdiction and protect the minor child from being relegated to a jurisdictional vacuum where no court would have been present to enforce visitation or, perhaps more importantly, child support obligations. Unquestionably, the Utah or North

Appellant also cites *Dahlen v. Dahlen* (N.D.1986), 393 N.W.2d 765, which she asserts is "a very similar situation" to the cause *sub judice*. In *Dahlen*, the mother was awarded custody of the minor children in August 1982, by a court in North Dakota and moved to California in 1983. In 1984, the father moved to Minnesota and in August 1985, filed an *ex parte* motion for temporary custody with the original court which had granted custody to his ex-wife. Although there is no mention that the courts in either California or Minnesota had attempted to assert jurisdiction, the North Dakota Supreme Court held that the PKPA preempted that state's version of the UCCJA and, because both parties and the minor children had left the state, the courts in North Dakota lacked jurisdiction to consider the matter.

This court is obviously not bound by the decisions of the North Dakota Supreme Court. More importantly, however, there are two major factual differences which distinguish *Dahlen* from the cause *sub judice*. The first of these differences is that there appears to have been no agreement between the states that North Dakota was the proper forum to exercise jurisdiction as there was between Ohio and Utah in this case. Thus, there is no evidence of the sort of interstate cooperation envisioned by the PKPA. The second difference between these cases is that the North Dakota Supreme Court would have found a lack of jurisdiction even under its own version of the UCCJA, *id.*, 393 N.W.2d at 768, fn. 5, and need not have reached the preemption issue. This is clearly a different situation than that in the case at bar where Ohio's version of the uniform Act would have allowed the court below to retain jurisdiction. Accordingly, the *Dahlen* case is not persuasive support for the proposition that Ohio law has been preempted under the circumstances herein.

██ Another factor buttresses our conclusion on this issue. Appellant's entire argument rests solely on subsection (d) of that portion of the PKPA codified at Section 1738A, Title 28, U.S.Code. However, this subsection should be read *in pari materia* with the rest of the statute, which is entitled "[f]ull faith and credit given to child custody determinations." The statute requires that every state shall enforce child custody determinations made by a court of another state. *Id.* at subsection (a). Nevertheless, the child custody determination can be modified by another state if, *inter alia*, the original state no longer has jurisdiction. *Id.* at subsection (f)(2). The continuation of state jurisdiction is then determined by subsection (d) of the statute. In short, the statutory provision upon which appellant bases her argument is there for purposes of

---

Carolina courts will eventually exert control over this case and, at that time, the court below should be petitioned to relinquish jurisdiction.

determining whether a state can modify a child custody determination made previously by another state.

■ There is no indication that subsection (d) of Section 1738A, Title 28, U.S.Code was intended as an absolute bar to a state's assuming jurisdiction outside the context of a full faith and credit problem. Had Congress intended such a result it presumably would have enacted a clearer statute. In areas state law has traditionally occupied, there is a presumption that state law is not superseded by federal law "unless that was the clear and manifest purpose of Congress." *Jones, supra,* 430 U.S. at 525, 97 S.Ct. at 1310, 51 L.Ed.2d at 614; *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459. As suggested by the United States Supreme Court, domestic relations matters have usually been left to the states. See *Thompson, supra,* 484 U.S. at 186, 108 S.Ct. at 520, 98 L.Ed.2d at 524, fn. 4. There being no clear indication that Congress intended the statute to divest a state court of jurisdiction outside the context of a jurisdictional conflict or full faith and credit problem, we decline to hold that Ohio law has been preempted in this instance.

Finally, our decision herein is consistent with the policy of both the UCCJA and PKPA to discourage "child snatching" and "forum shopping." The Referee's Report filed October 8, 1991, describes appellant's move to Utah as being indicative of "a custodial parent * * * remov[ing] a child from this jurisdiction *with apparent intent* to deprive the non-custodial parent of his visitation rights and forestall this court from remedying this wrong." (Emphasis added.) There is ample evidence in the record to support this interpretation of the events which transpired below. It would be ignoble of this court to construe the PKPA or UCCJA in such a manner so as to sanction the very activities which Congress and the General Assembly sought to prevent. For these reasons, appellant's first assignment of error is overruled.

■ In her second assignment of error, appellant argues that the lower court impermissibly limited the time for the October 11, 1991, motion hearing to three hours total or one and one-half hours per party.[11] We disagree. It is well settled that a trial court judge possesses inherent power to regulate court proceedings. *State ex rel. Butler v. Demis* (1981), 66 Ohio St.2d 123, 128, 20 O.O.3d 121, 124, 420 N.E.2d 116, 119; *Maddex v. Columber* (1926), 114 Ohio St. 178, 183, 151 N.E. 56, 57. A ruling or order by the court affecting the conduct of trial will not be reversed unless the complaining party demonstrates a prejudicial

---

11. In actuality, this hearing was before a referee. A court referee generally has the power to regulate proceedings to the same extent as the trial court. See Civ.R. 53(C). We will, therefore, refer to the referee as the "trial court" in order to remain consistent with appellant's argument.

abuse of discretion. 5 Ohio Jurisprudence 3d (1978) 164, Appellate Review, Section 591. An abuse of discretion connotes more than an error of law or judgment; it implies an unreasonable arbitrary or unconscionable attitude. *Wilmington Steel Products, Inc. v. Cleveland Elec. Illum. Co.* (1991), 60 Ohio St.3d 120, 122, 573 N.E.2d 622, 624; *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142. Appellant fails to persuade us that this time limitation was either an abuse of discretion or caused her any prejudice. A number of depositions were submitted into evidence below and both appellant and a Chardene Alkire testified at length to the merits of appellee's motion to change custody. There is no indication in the record of what any additional evidence might have shown. We will not presume a prejudicial effect on a party where none is shown. Accordingly, the second assignment of error is overruled.

■ In her third assignment of error, appellant argues that the court's judgment to modify custody/allocation of parental rights was against the manifest weight of the evidence. It should be noted that an appellate court will not overturn the judgment of a lower court if it is supported by some competent credible evidence. See *Vogel v. Wells* (1991), 57 Ohio St.3d 91, 96, 566 N.E.2d 154, 159; *C.E. Morris Co. v. Foley Constr. Co.* (1979), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, at the syllabus. This is true even in those instances where the judgment is based on factual findings proposed to the court by a referee who originally heard the matter. See *Doughty v. Doughty* (Oct. 14, 1992), Athens App. No. 1510, unreported, at 6, 1992 WL 303142; see, generally, *DeSantis v. Soller* (1990), 70 Ohio App.3d 226, 590 N.E.2d 886. With this standard in mind, we turn to the specific arguments raised by appellant in her brief.

First, appellant contends that the factual findings necessary to sustain the statutory requisites for a modification of custody were against the manifest weight of the evidence. We disagree. The modification of custody/allocation of parental rights is governed by the following provisions of R.C. 3109.04(E)(1)(a):

"The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree * * * that a change has occurred in the circumstances of the child, his residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree * * * unless a modification is in the best interest of the child and one of the following applies:

" * * *

"(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child."

■ Thus, a modification of parental rights would not have been warranted in the cause *sub judice* unless there was some competent credible evidence to the effect that (1) there has been a change in circumstances, (2) modification is in the best interest of the child, and (3) any harm likely to be caused by a change in environment is outweighed by the advantages. We first consider whether there was sufficient evidence of a "change in circumstances."

■ It is a well-settled rule in Ohio that a custodial parent's interference with visitation by a noncustodial parent may be considered as part of a "change of circumstances" which would allow for modification of custody. See *Lenzer v. Lenzer* (1962), 115 Ohio App. 442, 21 O.O.2d 67, 183 N.E.2d 144; see, also, *Well v. Well* (1990), 70 Ohio App.3d 606, 610, 591 N.E.2d 843, 845 (Harsha, J., dissenting); *Grant v. Grant* (July 21, 1989), Wood App. No. WD–88–29, unreported, 1989 WL 80951; *Gordon v. Gordon* (Oct. 9, 1987), Athens App. No. 1334, unreported, at 15–16, 1987 WL 18751.[12] This rule is also applied by the majority of state jurisdictions in the country. See Annotation (1984), 28 A.L.R.4th 9, 15–20, Section 3. Appellee gave the following testimony as to the problems he has had with appellant insofar as his exercise of visitation rights:

"Q: Now Michael can you without going into [a] great deal of detail, outline what kind of involvement you had with Meg in her life?

"A: Restricted. Margaret and I separated [when] Meg was only five and a half months old. It quite frankly has been a fight right from the very beginning to have any contact with Meg at all. That the only time frankly when I have been able to have contact is when I've had to spend more money with you than what I care to, to go to court and get orders to force some sort of visitation. Throughout I have asked Margaret again and again when can I see Meg, when, when, when, right from the separation her response was well I've got to think about it, I've got to think about it, I got to think about it and without benefit of the court I haven't been able to have contact.

---

**12.** In Am.Sub.H.B. No. 591 (143 Ohio Laws, Part IV, 5957, 5965), the General Assembly enacted legislation which allowed a court to modify custody if it found any continuous or willful denial of visitation independent of any change in circumstances. This language was then deleted by provisions in Am.Sub.S.B. No. 3 (143 Ohio Laws, Part I, 53, 119). Appellant argues that, by deleting this language, the General Assembly has expressed its intent that the continuous, willful denial of visitation cannot, of itself, justify a change of custody. Assuming that to be true, this does not alter the common-law principle that interference with visitation may be considered as part of a change of circumstances. The legislation of 1990–1991 appears merely to have elevated, and then deleted, the denial of visitation to the status of an independent reason to modify custody.

"* * * *

"Q: Now Michael I'd like to turn the clock back to early part of 1990, approximately three or four months after the divorce was granted. Were there a series of problems with the time ordered by the court that you were to have with Meg?

"A: Yes.

"Q: And again I, we have an outline of these in the file and since we are limited on time, I'd like for you to try in general [to] describe the problem and perhaps go through it as quickly as you can as to what you encountered with Margaret?

"A: I think the record speaks to itself. Margaret [has] unilaterally on a great many occasions determined that Meg was not to have the visitation with me. There have been various arguments that she'd offer for that. I recall in the September hearing for example, her insistence that driving that long distance back and forth once a month was potentially to Meg, not good for her. I remember her arguments and the arguments of the psychologist that she presented that said these long drives are not a very good idea. Margaret has[.]"

Appellee also testified that he was denied any visitation whatsoever for the first few months after appellant moved the minor child to Utah. This evidence is clearly sufficient to demonstrate a systematic interference with appellee's visitation rights. There is, however, other indicia of a change in circumstances. For instance, appellee testified that appellant regularly demeans him in front of their daughter and "minimizes the importance of her dad's role with her life." There is also testimony by Dr. Alan O'Leary, psychologist, to the effect that appellant has appeared to become "somewhat threatened by [appellee's] interest in remaining involved with the child and that she was having difficulty in the custodial role as far as shared parenting." Dr. O'Leary further testified that he believed appellant's continued difficulty in providing visitation access to appellee could cause harm to their daughter. This opinion parallels the referee's observation below that appellant appeared somewhat "emotionally unstable." In short, we conclude that there was sufficient evidence to demonstrate that a "change of circumstances" has occurred since the prior decree.

■■■ We next consider whether there was sufficient evidence to demonstrate that the modification of parental rights was in the child's best interest. This sort of determination was to have been made by considering all relevant factors including those set forth in R.C. 3109.04(F)(1). A number of these factors were considered by the referee in her report filed on November 12, 1991. For instance, the referee found that the minor child had, as yet, established no strong interpersonal relationships with her maternal relatives and that her ties to North

Carolina pre-date any move to Utah.[13] This is borne out by evidence in the record. Appellant and the minor child moved to Utah in February 1991. Appellee obtained the interim custody order and retrieved his daughter in August of that year. Appellant testified that, while living in Ohio, she saw her family in Utah only once or twice a year. This would, ordinarily, have been insufficient for the minor child to have developed a strong interrelationship with her grandparents and there was no evidence introduced below that any such bonding took place in the few short months before the child returned with her father to North Carolina.

By contrast, the minor child has visited appellee in North Carolina since the time of the divorce. She has frequent interaction with local children and two "best friends" in the neighborhood. Although we agree with appellant that the maintenance of strong relationships with grandparents and extended family takes priority over social contacts, there is no evidence of such a relationship while in Utah.

The referee also found that appellant had continuously and willfully denied appellee's right of visitation and that appellee seemed to be the parent most likely to honor and facilitate visitation in the future.[14] As previously discussed, there is ample evidence to support a finding of a continuous and willful denial of visitation. There is equally sufficient evidence that appellee would be more likely to honor visitation rights in the future. The following testimony was given by appellee with respect to his views on providing access for the minor child to visit with her mother:

"Q: Michael if the court would determine that you should be the primary residential parent, what is your opinion concerning providing access to Margaret to Meg?

"A: There's no question about what I think is important. The stability, the order, the regularity, the contact that Meg has with both of her parents I think is what is essential, when we talk about order, so that a regular two month one month would do that.

" * * * *

"Q: But you are willing to permit that to happen.

"A: *I want that to happen, not permit it, I want that to happen.*" (Emphasis added.)

---

13. See R.C. 3109.04(F)(1)(c) and (d).

14. See R.C. 3109.04(F)(1)(f) and (i).

The referee found no factors which would weigh against a change in custody and this evidence is clearly sufficient to sustain a finding that the modification of parental rights was in the child's best interest. Appellant makes no real argument that the lower court and the referee erroneously considered these factors. Rather, appellant contends that it would be error not to find it in the child's best interest for her to retain custody in light of her status as "primary caregiver" and the strong mother-daughter relationship. We disagree.

■■■ There is no question that Ohio courts must give due consideration to which parent was "primary caregiver" in fashioning a custody award. See *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 23, 550 N.E.2d 178, 180. To that end, this court and others throughout the state have long considered the primary caregiver doctrine as one of those unenumerated factors to be considered in entering a custody order pursuant to statute. See, *e.g., Seibert v. Seibert* (1990), 66 Ohio App.3d 342, 345, 584 N.E.2d 41, 43; *Roth v. Roth* (1989), 65 Ohio App.3d 768, 773, 585 N.E.2d 482, 485; *Thompson v. Thompson* (1987), 31 Ohio App.3d 254, 257, 31 OBR 538, 541, 511 N.E.2d 412, 415; see, also, *Lee v. Lee* (Apr. 3, 1991), Highland App. No. 764, unreported, at 2–3, 1991 WL 62150. The other statutory factors, however, preclude any sort of presumptive quality being given to the doctrine. *Seibert, supra,* 66 Ohio App.3d at 346, 584 N.E.2d at 43; *In re Maxwell* (1982), 8 Ohio App.3d 302, 306, 8 OBR 409, 413, 456 N.E.2d 1218, 1222. We therefore reject appellant's argument that she should have retained custody on this factor alone to the exclusion of any other consideration.[15]

---

15. Our analysis of this issue assumes that the "primary caregiver" doctrine would even apply in the context of a modification proceeding. In nearly every case, the custodial or residential parent would, *ipso facto,* be the primary caregiver. The consideration of this factor in a modification proceeding would be redundant given the statutory preference for retaining the custodial parent. The judicial determinations which must be made pursuant to R.C. 3109.-04(E)(1)(a), prior to modifying the allocation of parental rights, already emphasize a preference for maintaining a child with the residential parent. There would seem to be no reason to create an even greater bias against custody modifications.

Appellant cites no authority for the proposition that the primary caregiver doctrine is applicable in modification proceedings. Although our own research uncovers some case law where the doctrine is discussed in the context of a modification proceeding, the issue of its applicability in those circumstances is never squarely addressed. See, *e.g., Clontz v. Clontz* (Mar. 9, 1992), Butler App. No. CA91-02-027, 1992 WL 44979. Still, the overwhelming majority of cases discussing the doctrine involve initial custody awards after divorce. See, *e.g., Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 23, 550 N.E.2d 178, 180; *Seibert v. Seibert* (1990), 66 Ohio App.3d 342, 345, 584 N.E.2d 41, 43; *Thompson v. Thompson* (1987), 31 Ohio App.3d 254, 257, 31 OBR 538, 541, 511 N.E.2d 412, 415; see, also, Annotation (1985), 41 A.L.R. 4th 1129, fn. 1 (excluding cases involving post-decree proceedings to change custody). Although we do not specifically reach the issue herein, our research discloses several cases which would suggest that consideration of this doctrine is not proper in the context of a modification proceeding. For example, several Ohio decisions have held that a parent who obtains a temporary custody order should not be able to "bootstrap" that temporary order into a "preferred custodial position." See *Chambers v. Chambers* (Mar. 16, 1992), Butler App.

Furthermore, the referee noted in her report(s) that appellant had been the residential parent for the minor child since the 1989 divorce and that there was a "bonding relationship between [the child] and each of her parents." This would indicate to us that the referee was aware of the strong mother-daughter relationship and considered that appellant was the primary caregiver. The referee apparently chose not to place any appreciable weight on this factor in determining the child's best interest. Given the other evidence presented in this case, we discern no error in that decision.

 Finally, we consider whether there was sufficient evidence to determine that any harm likely to be caused to the minor child by the change in environment would be outweighed by the advantages. The referee made this determination on the basis that "the child will be able to maintain a meaningful relationship with both parents" after the modification of parental rights. Our review of the record uncovers sufficient evidence to support that determination.

It is undisputed that both parties are competent capable parents and that the minor child should have contact with each of them. In particular, appellee is described as "a man with an unusual orientation toward and capacity for effective parenting," and Dr. O'Leary testified that the minor child would *not* "be better off in Utah if she was cut off from her father." The record, however, indicates that there has been a systematic interference with appellee's visitation rights since the time of the divorce. Such interference injures the child and deprives her of the nurturing, support and companionship of her father. The court below sought to rectify this injury through modification of parental rights in such a manner as to afford time with each parent. Given appellant's poor compliance with previous visitation orders, and considering appellee's assurances that he would comply with such orders, it would seem that the only way to achieve optimum contact with *both* mother and father would be to make appellee the residential parent. The benefits and advantages to contact with both parents clearly outweigh any harm caused by the change in environment.

---

No. CA91–07–120, unreported, 1992 WL 50024; *Berry v. Berry* (Mar. 12, 1992), Clermont App. No. CA88–11–081, unreported, 1990 WL 25703. In considering how other jurisdictions have treated this issue, we note that the North Dakota Supreme Court has declined to apply the primary caregiver doctrine in a modification proceeding because existing law already protected the stability of the custodial parent-child relationship and would not allow for modification without showing "a significant need for doing so." See *Blotske v. Leidholm* (N.D.1992), 487 N.W.2d 607, 609; *Von Bank v. Von Bank* (N.D.1989), 443 N.W.2d 618, 621; see, also, *Wright v. Wright* (N.D.1988), 431 N.W.2d 301, 303. The court reasoned that "[a]dding another legal presumption for the custodial parent would *overbalance the scales too far.*" (Emphasis added.) *Von Bank, supra,* at 621. Likewise, Ohio law already prevents a change of custody except upon a showing that specific statutory factors have been met. There is, arguably, no further reason to apply the primary caregiver doctrine under these circumstances.

We concede that appellant presented an abundance of contradictory evidence below. Appellant denied that she had impeded appellee's visitation with his daughter. Appellant further explained that she had not moved to Utah to "cut off" such visitation and stated that "[i]t's important for [the minor child] to know her father and spend time with him. * * *" Appellant assured the court below that she believed in family and that appellee and his daughter "need time together so that they can grow * * * and that relationship can develop." However, the evidence discussed previously clearly belies these sentiments.

The factual findings necessary to grant the motion to modify parental rights in this case depended heavily on the assessment of witness credibility. There are several instances in the record where it would appear that the referee, and consequently the trial court, had problems in finding appellant's evidence to be credible. For instance, appellant firmly denied that she had ever demeaned her former husband in front of the minor child. There was, however, an audiotape played during the hearing below which apparently demonstrated that disparaging remarks had been made to the minor child. The referee expressly opined that appellant's testimony on this subject "was not a truthful statement." Additional damage was inflicted to her credibility when appellant attempted to introduce evidence that the minor child had returned from visitations with her father with bruises and a cigarette burn on her body. The referee discounted these allegations, and their accompanying insinuations of abuse, on the grounds that there was no further medical evidence to buttress them and that they tended to be negated by the deposition testimony of another witness. The referee concluded that appellant's "attempts to persuade the [c]ourt that [appellee] is negligent, if not abusive, in his care of the child are *self-serving, at best,* and confirm [the] allegations that [appellant] is *trying to undermine his relationship with his daughter.*" (Emphasis added.) The trial court, after conducting its own independent review of the evidence, opined as follows:

"Another concern is the apparent attempt to build a case that defendant has been somehow neglectful and/or abusive of the minor daughter, when she has been under his care. * * * But, the thesis of this argument seems discredited by other witnesses * * *. *It requires great restraint to avoid viewing this as a desperate measure to try to take attention away from events in the case* which require drawing some negative conclusions about the intentions of plaintiff, regardless of whether her intentions were based on sincere convictions." (Emphasis added.)

██ ██ Ordinarily, the lower court is better able than this court to observe a witness and assign the proper weight to her testimony. See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276. The court is then free to rely on all, part or none of the testimony of that witness.

See *Barber v. Barber* (July 30, 1992), Ross App. No. 1804, unreported, at 9, 1992 WL 188492; see, also, *State v. Harriston* (1989), 63 Ohio App.3d 58, 63, 577 N.E.2d 1144, 1147. In this case, however, the trial court was in the same position that we are in and was limited to reviewing witness testimony without the advantage of physically viewing the witness in order to determine credibility. *DeSantis, supra,* 70 Ohio App.3d at 233, 590 N.E.2d at 891. The court below was cognizant of this problem and expressly stated that it would rely heavily on the referee in assessing witness credibility and resolving conflicts in testimony. We discern no error in such reliance. The court thereafter independently weighed the evidence itself and reached the same conclusions as the referee. There is sufficient evidence to support those conclusions and, accordingly, the third assignment of error is overruled.

In her fourth assignment of error, appellant argues that the contempt citation was both against the manifest weight of the evidence and "jurisdictionally deficient." These are two separate issues and we shall address them individually. First, as discussed previously, there is ample evidence that appellant impeded or obstructed court-ordered visitation. Nevertheless, appellant argues that contempt is "harsh treatment" and "appalling" in light of the lower court's judgment of June 5, 1991, which conceded that monthly visitation had been "rendered impracticable" by appellant's move to Utah. This argument ignores the evidence that appellee had already been denied *any* visitation for the previous March, April or May before that judgment was ever entered. The fact that a judgment may appear impracticable, in retrospect, does not sanction a party's defiance of a standing visitation order.[16]

Appellant also argues that the contempt citation should be reversed because the proceedings thereunder were "jurisdictionally deficient." We disagree. As previously discussed, the court below retained continuing jurisdiction on visitation matters with respect to the minor child. A trial court's continuing jurisdiction is then invoked by filing a motion in the original action and serving it on the adverse party pursuant to Civ.R. 4 through 4.6. See Civ.R. 75(I); see, also, Baldwin, Ohio Domestic Relations Law (1987) 463, Section 47.01(B). The

---

16. In her reply brief, appellant contends that her attorney had a telephone status conference with the referee on February 20, 1991, at which time the referee conceded that the visitation schedule was "impracticable." Appellant argues that she relied on this statement in denying visitation. Assuming *arguendo* that such a statement was made during the status conference, there is no indication in the record that a court order was ever entered to suspend the impending visitation for March, April and May of that year. Appellant cites no authority of law, and we are not aware of any, which supports the proposition that a phone conversation with a referee is sufficient to suspend a standing court order. In any event, a party should not act in such a manner as to disregard a valid court order until such time as it is modified by a new *court order.*

service of such process is essential for obtaining personal jurisdiction over a party, see, generally, 22 Ohio Jurisprudence 3d (1980) 462, Courts and Judges, Section 297, and personal jurisdiction is essential to rendering a valid personal judgment, *Maryhew v. Yova* (1984), 11 Ohio St.3d 154, 156, 11 OBR 471, 472, 464 N.E.2d 538, 540. However, the defense of a lack of personal jurisdiction is waived if not raised in a motion to dismiss or made in a responsive pleading. See Civ.R. 12(H)(1).

The aforementioned motion to dismiss the action below was based on an asserted lack of subject matter jurisdiction pursuant to Civ.R. 12(B)(1). Any further assertion as to a lack of personal jurisdiction should have been included as an additional ground for dismissal as required by Civ.R. 12(G). The failure to include this ground in the motion to dismiss constitutes a waiver of any defect in service or lack of personal jurisdiction. *Id.*; see, also, *Trubulas v. Doland* (1987), 39 Ohio App.3d 62, 66, 528 N.E.2d 1313, 1317; *Detroit, Toledo & Ironton Ry. Co. v. Maxine's Potato Serv., Inc.* (1983), 13 Ohio App.3d 157, 161, 13 OBR 191, 195, 468 N.E.2d 361, 365. Thus, we find no merit in this argument.

Although appellant's motion to dismiss was denoted therein as a "special and limited appearance," the concepts of limited and general appearances were abolished when Ohio adopted the Rules of Civil Procedure. 1 Ohio Jurisprudence 3d (1977) 492, Actions, Section 102. The characterization of that motion as a "limited appearance" was, therefore, of no importance and did not prevent application of the waiver provisions in Civ.R. 12(G). Appellant also noted in a footnote to her motion that she did not "concede the issue of personal jurisdiction." Be that as it may, appellant never sought dismissal for that reason. The Ohio Civil Rules retain the philosophy that a party must contest jurisdiction over his person at the earliest opportunity. McCormac, Ohio Civil Rules Practice (1970) 137, Section 6.17. The proper method to challenge the asserted lack of personal jurisdiction below would have been to combine this defense with the motion to dismiss for lack of subject matter jurisdiction and request dismissal on either ground. Appellant failed to do this and thereby waived any jurisdictional defect. The assignment of error is, accordingly, overruled.

Appellant's final assignment of error offers a perplexing and seemingly multi-faceted argument. First, appellant argues that the trial court erred in adopting the visitation schedule proposed by the referee for appellant to visit with her daughter. Appellant does not argue that the schedule provides too much or too little time with the child, but argues that it was based on inadmissible hearsay and opinion given by Dr. O'Leary in the proceedings below. However, our review of Dr. O'Leary's testimony reveals that the substance of his opinion was to the effect that the child should have as much exposure to each parent as possible. In short, whichever party was destined not to become the residential parent

should have as much visitation as possible. We fail to understand how this sort of an opinion could possibly have prejudiced appellant's interests.

Appellant then goes on to argue that Dr. O'Leary's opinions were impermissibly considered for purposes of determining the child's "best interests" and that "custody of the minor child should be restored to [appellant] subject to [appellee's] visitation rights." Though inartfully worded, we construe this argument to mean that the trial court erroneously relied on Dr. O'Leary's opinion for purposes of determining the best interests of the minor child and ordering a modification of custody. For the following reasons, we disagree.

To begin, the referee's report filed on November 12, 1991, makes its determinations as to the child's "best interests" primarily by analyzing the R.C. 3109.-04(F)(1) factors. There is no indication in her report that the referee even relied on Dr. O'Leary's opinion in determining the "best interests of the child" issue. However, inasmuch as Dr. O'Leary's opinions were relied on by the referee in other segments of her report, we will consider whether this evidence was properly admitted for any purpose.

■ The essence of appellant's argument is that the opinions of Dr. O'Leary were formed entirely on the basis of evaluations by Dr. Suzanne Apple, a colleague, and were therefore inadmissible because he had made no first-hand observations of his own. In fact, appellant contends that Dr. O'Leary never even met with the minor child. However, those portions of the transcript to which we are cited do not bear out this contention and our own review of the record uncovers the following colloquy which occurred during cross-examination:

"Q: * * * Doctor, you've had no opportunity to evaluate the child since she has gone to Utah have you?

"A: That's true I haven't."

This testimony is far from clear, but tends to suggest that the witness may have evaluated the minor child prior to the move to Utah. In any event, Dr. O'Leary testified that his instructions from the court below were to evaluate *appellant and appellee* with regard to their interaction with the minor child. The undisputed evidence at the hearing was that such an evaluation occurred in January 1991, prior to the move to Utah. The witness then gave his expert opinion as to the parties' interaction with each other and the probable effect which it would have on the minor child. We perceive no error in allowing such an opinion into evidence.

■ If scientific or other specialized knowledge will assist the trier of fact to understand the evidence, an expert witness qualified by education, knowledge, skill, experience or training may give an opinion as to the evidence. Evid.R. 702.

Such an opinion must be based on facts and data perceived by the expert or admitted into evidence at the hearing. Evid.R. 703. The opinions given by Dr. O'Leary during the proceedings below were clearly based on his own evaluation, or perception, of the parties herein. Although appellant argues that Dr. O'Leary has never met the minor child, that fact is not apparent from the record. For these reasons, the fifth assignment of error is overruled.

Having considered all errors assigned and argued herein, and finding them to be without merit, the judgment of the trial court is affirmed.

*Judgment affirmed.*

GREY and HARSHA, JJ., concur.