ROWE, Appellant,

v.

FRANKLIN, Appellee.■

[Cite as *Rowe v. Franklin* (1995), 105 Ohio App.3d 176.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–930522, C–940358.

Decided June 28, 1995.

*Stephen R. Felson,* for appellant.

*Sallee Fry Waterman Co., L.P.A., Sallee Fry Waterman* and *Diane E. Perlich,* for appellee.

GORMAN, Presiding Judge.

Appellant, Kimberly Rowe ("mother"), appeals the trial court's decision designating appellee, Donald J. Franklin ("father"), the residential parent and legal guardian of their then five-year-old son. In her single assignment of error she challenges the trial court's allocation of all parental rights and responsibilities to the father. Because the trial court's findings demonstrate that it improperly focused on a "reproval of the mother" standard in determining the best interests of the child, we find that the assignment of error is well taken.

## I.  FACTS

The parties were married on July 25, 1987. On February 20, 1988, their son was born. In December 1991, the mother left the marital residence with the child and filed a complaint for divorce and a motion for temporary residential parenting rights and support. On January 8, 1992, the father counterclaimed for divorce and also requested temporary parenting rights and support.[1] The child remained in the mother's custody pending either a temporary or a permanent custody determination by the court.[2] The parties signed an agreed entry regarding visitation and child support. During May 1992, with the father's

---

1.  The divorce decree was entered April 12, 1994. The mother filed a notice of appeal from the trial court's decision concerning the child's custody and a notice of appeal from the order concerning the divorce decree. She has complained of no specific error in the divorce decree, and this court has consolidated the two appeals.

2.  While no determination as to temporary custody was entered by the court, the trial court did order that neither party was to remove the child from the state of Ohio and establish residence in another state without either a court order or a signed agreement filed with the court.

knowledge, the mother moved to Versailles, Kentucky, for what she expected to be a short time. She stated that the move was made to be closer to her job as a parttime pilot for the U.S. Army so she could increase her flying time and earn more money. During this same time, she was attending law school, after having earned a four-year degree in international affairs and business and having taken some graduate business classes. On May 13, 1992, the mother filed a notice of relocation providing her new address. On June 16, 1992, the parties filed an agreed entry which included a date for an oral hearing to contest the mother's relocation and a schedule for sharing parental responsibility for the summer. The father, an ironworker, was unemployed during that summer.

On September 10, 1993, the mother filed a motion to modify the court's order to allow her to remove the child to Versailles, Kentucky, and to establish his residence there. She had applied to take classes through the University of Kentucky Law School in July and had become pregnant sometime in May by a man whom she had begun seeing in March, and who was married but separated from his wife. In August she enrolled her son in a private school for the times she would attend law school classes. In response to her motion, the father filed an emergency motion for contempt and for return of the child to Ohio. The trial court denied her motion, held the father's contempt motion in abeyance, and allowed the child to remain with the mother until the completion of a previously ordered custody investigation.

Dr. Cynthia Dember completed a psychological evaluation on May 1, 1992. Parenting specialist Jayne Zuberbuhler completed a predecree parenting report on February 18, 1993. On March 5, 1993, the father moved to update Dr. Dember's evaluation, asserting that the mother's move to Kentucky constituted an extreme change of circumstances. The motion was granted. In the spring of 1993, the mother requested that Dr. Stuart A. Cooke evaluate the reports by Dr. Dember and Ms. Zuberbuhler and provide the trial court with his professional opinion. Dr. Dember and Ms. Zuberbuhler, while finding both parents adequate, ultimately recommended custody of the child be given to the father. Dr. Cooke recommended, however, that the mother be designated the residential parent.

Following a hearing eighteen months after the parties separated, the trial court removed custody from the mother and allocated full parental rights of the five-year-old child to the father. The mother appealed this decision, arguing that her move to Kentucky was an inappropriate basis for denial of custody and that the trial court further failed to consider that she was the child's primary caretaker.

## II. R.C. 3109.04 AND LIFESTYLE CHOICES

In determining which parent should have custody of a minor child in a divorce proceeding, the trial court is bound to consider the best interests of the

child. R.C. 3109.04(F). The relevant factors in determining the best interests of the child are enumerated in R.C. 3109.04(F), but the statutory factors are not all-inclusive.

■ Concern for a child's well-being or best interests does not, however, provide the court *carte blanche* to judge the rights and lifestyles of parents by nonstatutory codes of moral or social values. Although a court is not obligated to wear blinders as to a parent's lifestyle and/or morals, including sexual conduct, any state interest in competing lifestyles and accompanying moral values which affect child custody would most equitably be served if limited to a determination of the direct or probable effect of parental conduct on the physical, mental, emotional, and social development of the child, see *Whaley v. Whaley* (1978), 61 Ohio App.2d 111, 118, 15 O.O.3d 136, 140–141, 399 N.E.2d 1270, 1275, as opposed to a determination of which lifestyle choices made by a parent are "correct." In a society as diverse as the one in which we live a court is ill-equipped to determine which of such choices are "correct."

## III. CONSIDERATION OF DIRECT ADVERSE IMPACT OF PARENTS' CONDUCT

■ Many of the concerns expressed by the trial court in its findings of fact involved the mother's relationship with her male companion and the lifestyle choices she has made concerning her career. Where there is evidence of parental nonmarital sexual conduct, Professor Nora Lauerman has identified four basic approaches used by courts in determining child custody and parental rights. Lauerman, Nonmarital Sexual Conduct and Child Custody (1977), 46 U.Cin.L.Rev. 647. The following are still relevant:

(1) "Conclusive disqualification": A parent's adultery is an absolute bar to custody as a matter of law.

(2) "Presumptive unfitness": The parent's nonmarital sexual conduct is viewed as probably incompatible with the best interest of the child. To overcome the unsuitability presumption, the parent has a heavy burden to rebut the presumption of disqualification.

(3) "Direct adverse impact": The parent's nonmarital sexual conduct is irrelevant to custody unless it has a direct adverse impact on the child. It includes "clear direct impact," present and immediate impact, and "speculative direct impact," the risk of psychological, moral, or other impact.

(4) "Presumptive direct adverse impact": Although the court uses "impact" terminology, it explicitly or implicitly finds that the parent's nonmarital sexual conduct has an adverse impact on the child. *Id.* at 654–672.

The catalogue of cases cited by Professor Lauerman illustrates that, with the exception of the "direct adverse impact" test, the other tests have traditionally been more rigidly applied by courts where the mother is seeking custody of the child and tend to impose punishment on the mother for her nonmarital sexual activity. We find that the reasons for rejecting each in favor of the "direct adverse impact" test are persuasively stated in *Whaley v. Whaley, supra,* 61 Ohio App.2d at 116–119, 15 O.O.3d at 139–141, 399 N.E.2d at 1274–1276. The direct adverse impact test allows the court to consider moral principles, but only in relation to the direct or probable effect of the parent's conduct on the child.

While we recognize that the current situation is not a post-decree modification because there was no formal custody order to be modified, in a situation like this where the mother had actual physical custody of the child for an eighteen-month period, we find it difficult not to view the trial court's decision as a modification of the *status quo* and to analogize this situation to a custody modification. A modification of a prior custody order under R.C. 3109.04(E)(1)(a) depends on two factors: (1) a change of circumstances has occurred, and (2) the modification is necessary to serve the best interests of the child. In post-decree modifications the legislature has recognized the importance for a child to remain in a continuing relationship and the potential consequences detrimental to the child posed by a change of custody. *Whaley v. Whaley, supra,* 61 Ohio App.2d at 112, 15 O.O.3d at 136–137, 399 N.E.2d at 1272. Former R.C. 3109.04(B)(3) provided that where custody was contested, the test for modification of custody was specifically "direct adverse impact," *i.e.,* that the child's current situation endangered significantly his physical well-being or his mental, moral or emotional development. The current statute, R.C. 3109.04(E)(1)(a)(iii), states that the test for modification is whether "[t]he harm likely to be caused by a change of environment is outweighed by the advantages of such a change to the child." The amendment seeks to continue custody with the residential parent initially designated with even broader emphasis on the best-interest-of-the-child standard.[3]

An initial custody award is governed by R.C. 3109.04(B)(1) and depends upon the best-interests-of-the-child test only. Under R.C. 3109.04(B)(1) (formerly R.C. 3109.04[A]), the legislature has not provided the same threshold when the court makes an initial custody award. The inquiry in an initial custody award is solely the best interests of the child. In light of legislative policy favoring continuity of the relationship for post-decree modification, we see no reason why consideration of the direct adverse impact of a parent's conduct or standards on the child should not also apply to initial custody determinations in this case. Where the

---

3. R.C. 3109.04(F)(1) instructs the court in both initial custody awards and modifications of awards to look to the child's relationship with siblings and others who may significantly affect the child's best interest, as well as the child's adjustment to home, school and community.

parent has had custody of the child for a year or more before the decree is entered, the court has an equal interest in refraining from moving the child between parents like a pinball. The reasoning in the post-decree modification decisions seems equally applicable to initial custody determinations. See *Kraus v. Kraus* (1983), 10 Ohio App.3d 63, 10 OBR 73, 460 N.E.2d 680 (a man living in the mother's home was insufficient to warrant change of custody of fifteen- and twelve-year-old children); *In re Rex* (1981), 3 Ohio App.3d 198, 3 OBR 226, 444 N.E.2d 482 (mother had two illegitimate children by different men after decree); *Wyss v. Wyss* (1982), 3 Ohio App.3d 412, 3 OBR 479, 445 N.E.2d 1153 (where mother had man living with her absent evidence that her two children had knowledge of sexual activity or that it materially affected them); *Thrasher v. Thrasher* (1981), 3 Ohio App.3d 210, 3 OBR 240, 444 N.E.2d 431 (where mother's sexual conduct was never in presence of the children and the man never stayed overnight).

## IV.  STANDARD OF REVIEW

In conducting our review of the trial court's decision, we acknowledge that a trial court's decision concerning custody cannot be reversed by a reviewing court absent an abuse of discretion. *Miller v. Miller* (1988), 37 Ohio St.3d 71, 523 N.E.2d 846. An abuse of discretion implies an attitude of the trial court that is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140. "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 601. On appeal, a reviewing court may not substitute its judgment for that of the trial court. *Trickey v. Trickey* (1958), 158 Ohio St. 9, 47 O.O. 481, 106 N.E.2d 772.

From our review of the record, the trial court's findings of fact and conclusions of law reflect that it abused its discretion not for those specific reasons set forth in the mother's brief, but because we are convinced that the trial court did not consider in its analysis of the child's best interests whether the mother's conduct had a direct adverse impact on the child when it transferred custody and designated the father as custodial parent. We find significant the trial court's apparent judgmental attitude toward the mother's life choices.

## V.  REVIEW OF THE TRIAL COURT'S ORDER

We first note that the trial court, using the factors enumerated in R.C. 3109.04(F)(1), concluded that both parents had taken a proper parental interest in the child, that the child was very much attached to both parents, that the child interacted appropriately with both parents, that both parents loved and nurtured

the child, and that interference with either relationship could hurt the child. The trial court also determined that the child had bonded with his stepbrother, had a good relationship with the mother's male companion, and was doing well in the Kentucky school.[4] Even so, the trial court determined that the child should be removed from the mother and custody granted to the father.

## A.  ADJUSTMENT TO HOME, SCHOOL, AND COMMUNITY

The error in the analysis by which the trial court reached its conclusion, however, is apparent from its comparison of the mother's living situation with the father's. The trial court stated that for the first three years of the child's life, "[u]ntil Dec. 1991, the child lived in the marital residence which is presently occupied by [father]. He is most familiar with the surroundings, the neighborhood, the people in the neighborhood, etc. [The child] has roots in his home in Cincinnati and but for his mother's move to Kentucky, it appears that his home would be one of stability. He has family here both maternal and paternal. He has friends here. He has friends of both parents who care for him here. The only adjustment necessary for [the child] here is that his mother would not be here."

By contrast, the trial court concluded that the mother and the child did not have substantial roots in the Kentucky community, stating it had not been provided with much information regarding that community. The record, however, belies this contention. Uncontested information was available that the mother had been working in Kentucky for several years, that she had many friends there that she had met at work, that her son was friendly with and associated with her friends' children, that her son had adapted to the school he attended and had friends there, that the child had friends in the neighborhood with whom he played, and that he attended soccer and karate classes in Kentucky.

The trial court then "thoroughly examine[d]" the child's adjustment to his new home. In its decision the trial court described the child's home as consisting of "a mother who is attending law school, working part-time for the Kentucky National Guard, mothering an approximate six (6) month old child, dating a man (the father of her new child) who apparently spends a lot of his time at her house but lives elsewhere and is substantially financially dependent on this man. This Kentucky home has required tremendous adjustment on the part of the child and the evidence indicates that more adjustment must be made in the future."

The record does not support the trial court's finding that the home, the mother's work or her school schedule has required "tremendous" adjustment by

---

4. The trial court did not consider the wishes of the child in its determination, concluding it was inappropriate to do so in this case.

the child, nor does it indicate what will necessitate future adjustment.[5]  The trial court even observed that the child would need to make some adjustment no matter who the residential parent would be, but that the child was able to adjust to whatever obstacles were placed in his path.

## B.  PARENTS' MENTAL HEALTH

The trial court stated that it had no concerns about either parent's mental health.  It found the father to be stable and to have not subjected the child to changes as had the mother, although the court did not seem to consider significant the child's transfer to a new environment after eighteen months in the mother's custody.  In contrast it found that the mother made decisions that caused the court to question her stability.  Included in these "questionable" decisions were the many moves she made prior to her current situation, the move to Kentucky, and the sudden and complete relationship with her new male companion and the resulting pregnancy.  The trial court deemed that these were not decisions in the best interests of the child and concluded that appellant placed her needs before the child's needs.

The trial court failed to recognize that the moves were precipitated by the father refusing, upon advice of counsel, to move from the marital residence, thus forcing the mother to leave the marital residence with the child, if she desired to terminate the marriage, and to live with the child in a variety of makeshift homes for a short transitional period.  It entirely discounted how the father's decision subjected the child to changes in the environment.

## C.  RELOCATION

The trial court looked unfavorably upon the mother's decision to take the child to Kentucky.  It described the move as "a major problem."  It disapproved of the two-hour drive between the parents' residences, which it found created a "tremendous physical chasm between father and son" and was not in the best interests of the child.  In its view, the child "should have had the opportunity to be nurtured firsthand by both parents."  While concluding that it need not make a determination why the change in residence took place, the trial court decided it was not done in the best interests of the child.  In reality, however, the reason the mother first moved to Kentucky was to earn more money following the

---

5.  Zuberbuhler's report states that the child has had to make "a multitude" of adjustments including "the break-up of his parents' marriage, his parents' separation, the absence of his father in his daily life, his parents' struggles over custody, moving six times with his mother, his mother's new relationship * * *, the birth of his half-brother * * *, and the conscious or unconscious pressures from each parent to choose to live with them.  Undoubtedly [the child] is under much stress and it is taking its toll."

marital separation. The fact was acknowledged by the father's counsel in opening statement in opposition to the mother's motion to modify the order, in which counsel said that "as a result of financial circumstances, we understood it was better for her to be in Versailles for the summer." The trial court, however, stated that it found "little, if any value" in her "setting up residence in Kentucky."

The trial court also found that the move "has harmed to an extent the special relationship the child has had with his father since birth." While the record demonstrates that the child experiences some discomfort with the transition period concerning visits with the father and returning to the mother's residence, the record does not support the trial court's conclusion. In fact, the father's videotape of his son and him emphasizes the continuing closeness of that relationship. Furthermore, regardless of which parent received custody, the same basic problems of geographical distance, if any, would realistically occur for either party.

Although the court can consider nonresidency in determining the best interests of the child, R.C. 3109.04(F)(1)(j), nonresidency alone cannot deprive a parent of custody. *In re Marriage of Barber* (1983), 8 Ohio App.3d 372, 375, 8 OBR 485, 488, 457 N.E.2d 360, 363; see *Vincenzo v. Vincenzo* (1982), 2 Ohio App.3d 307, 2 OBR 339, 441 N.E.2d 1139.

### D. NONSTATUTORY FACTORS

In examining the parties' commitment to the child, a nonstatutory factor, the trial court concluded that "[p]ersonal accomplishments and career goals are obviously worthwhile undertakings. To accomplish what Ms. Rowe has as far as academics is concerned is very commendable. However this court perceives that this child has paid a price. The evidence has shown that Ms. Rowe returned to a full-time law school curriculum when the child was three (3) weeks old. Ms. Rowe returned to her job with the Kentucky National Guard when the child was six (6) weeks old. Ms. Rowe's time to nurture the child has been limited tremendously as she pursues other matters. The Court is cognizant of the time [the child] has spent with babysitters and at child care.

"In summation, this Court questions the priorities of Ms. Rowe. The *number of poor choices made by Ms. Rowe as to the best interests of [the child] coupled with her personal agenda* indicates to this court that she may not be as committed to [the child's] best interests as she should be."[6] (Emphasis added.)

---

6. Although courts must give due consideration to the "primary caregiver" doctrine in determining award of custody, it is only one of the unenumerated factors to be considered

The transcript of the mother's law school classes contained in the record indicates that she did not start law school until the fall of 1990 when the child was over two years old. It was at that time that the child received day-care supervision. She had returned to school earlier to continue the coursework necessary to obtain her undergraduate degree the spring semester of 1988 and began taking graduate courses primarily in the evening the following fall. The child was attended to by the parents, family or friends during this period of time. The record shows that the mother did not return to flying until the child was approximately eight months old, although she did participate in a monthly two-day weekend drill prior to that time. She testified that during the child's first year she flew approximately fourteen to sixteen days.

Although pursuing his career and designated as the primary financial support for the family, the father was deemed by the trial court to be dedicated to the well-being of his child and to have a "willingness to be *a good and proper* parent." (Emphasis added.)

The trial court also considered the mother's relationship with her male companion and concluded that he appeared to be a "good, dedicated individual." It assumed, however, that his working three jobs, settling down from the breakup of his previous marriage and taking care of two children "has to provide a great amount of stress to anyone" and that if the stress proved too much it would be to the detriment of the child. The trial court expressed concern that he became involved with the mother so shortly after his separation from his wife. It stated that it was in the best interests of the child that the mother's companion should have allowed some time "to settle down or regroup." The trial court indicated its concern that the mother's companion had not experienced the "culture shock" of daily life with two small children.

As to stability, the trial court concluded, "With Ms. Rowe, stability has been hard to come by. Since December of 1991 as Ms. Rowe has experienced personal problems, the child has had little stability. The current situation, though on its face appearing to be stable, is based on many factors that are questionable. The many 'what ifs' regarding Ms. Rowe's, Mr. Adams, and [the child's] future cause great concern to this court."

The trial court did not like that the mother became sexually involved with a man so soon after the breakup of both of their marriages and expressed concern whether her companion could handle the stress of so many changes in his life. There is a total absence of evidence in the record to suggest that the mother's relationship had any unfavorable effect on the child, or to support the trial

with the statutory factors and lacks presumptive quality. *Holm v. Smilowitz* (1992), 83 Ohio App.3d 757, 776, 615 N.E.2d 1047, 1059.

judge's concerns. Although the trial court expressed concerns about future potential problems, even describing the concerns as "what ifs," the record fails to demonstrate that the mother's relationship and resulting pregnancy and birth of her second child have had or probably will have a harmful effect on the child.

## VI.  CONCLUSION

Although the trial court explicitly stated that the best interest of the child was its primary consideration, the plain meaning of its reasons in reality constitute use of a "reproval of the mother" test.  Therefore, we conclude that the trial court abused its discretion by its reliance on an erroneous standard to justify the designation of the residential parent.  Here the trial court was not impressed by the mother furthering her educational and career goals as opposed to staying home with her child full-time following his birth.  Although the court perceived that the child had paid a price, the record does not support such a perception.  Furthermore, while the trial court took note that the child had been attended periodically by babysitters and daycare personnel, nothing in the record indicates a harmful effect on the child as a result.

We recognize that custody decisions today are becoming more challenging for trial courts as the gatekeepers where the number of women employed outside the home is increasing, the father's role within the family is changing, and family structures are becoming more diverse.  In spite of these ongoing changes, the trial judge must still determine what is in the best interests of a child whose parents no longer wish to continue their marriage.  While acknowledging the difficulty confronting the trial court, we conclude that it abused its discretion in designating the father as the residential parent of the child.  The trial court's very findings of fact and conclusions of law manifestly placed a disproportionate emphasis on the mother and her "priorities" and not enough on the best interests of the child.[7]

## VII.  DISPOSITION

Where it is held that the trial court abused its discretion by relying on an incorrect standard, an appellate court should not proceed to weigh the evidence to determine custody.  Instead, it should remand the case to the trial court for further proceedings in which it should weigh the evidence under the best-interests-of-the-child standard.  The trial court is better equipped to examine and weigh the evidence and to make the decision concerning custody.  *Miller v.*

---

7.  We note that the trial court may once again want to explore the option of a shared-parenting plan with the parents in that, with the passage of time, they may now be more amenable to that type of custody arrangement.

*Miller, supra,* 37 Ohio St.3d at 74, 523 N.E.2d at 849. The practical effect of a remand, however, presents new concerns. Due to the time since the trial court designated the father as the residential parent, a second change of custody may now well be detrimental to the child's adjustment despite the initial error. On the other hand, as Justice Douglas tersely noted in his concurring opinion in *Miller, supra,* 37 Ohio St.3d at 75, 523 N.E.2d at 850, remand may well effect nothing more than a charade resulting in the "same ultimate finding." Even so, we reverse the trial court's judgment and remand this cause for further proceedings in accordance with this opinion.

*Judgment reversed*
*and cause remanded.*

DOAN and MARIANNA BROWN BETTMAN, JJ., concur.