OPINION
{¶ 1} Defendant-appellant, Shereena Pazin (mother), appeals a decision by the Columbiana County Common Pleas Court designating plaintiff-appellee, Lawrence Pazin (father), as primary residential parent and legal custodian of their child, Matthew Pazin, in post-divorce proceedings. Mother alleges that the trial court failed to consider relevant evidence in making its determination, and that the trial court's decision was contrary to the evidence and an abuse of discretion.
 {¶ 2} Mother is a thirty-three year old Philippino-American, and is a student at Sinclair Community College. She is working toward entrance into a nursing program. When Matthew is not under her care, he attends Head Start for an academic program and day care. Mother testified at the August 2, 2007 trial that Matthew may attend beginning at 6:30 A.M. to 9:00 A.M. (9:00 A.M. being the latest a student may arrive at Head Start), until approximately 6:00 P.M. (Tr. 66-67.)
 {¶ 3} Mother has four other children under the age of five, all with a boyfriend. Mother testified at the time of trial that she was unemployed because she lost her job due to maternity leave, and that she needed to reapply. (Tr. 65.) Mother received child support, approximately $223 per month, and testified that family members and friends helped her financially. (Tr. 79.)
 {¶ 4} Father is fifty-nine years old and lives in East Liverpool in a home owned by his daughter. Father is self-employed selling merchandise at flea markets. His employment schedule varies from Thursday through Sunday depending on which flea market he is working. (Tr. 33.) Father's income information is not a part of this record.
 {¶ 5} Father has been married three times, and has four children (including Matthew) from four different relationships. (Tr. 31.)
 {¶ 6} Father testified that his daughter and other family live in Pittsburgh, PA.
 {¶ 7} In 1999, Father was convicted on two counts of attempted receiving stolen property. (Tr. 35.)
 {¶ 8} Father has back problems that affect his ability to sit, stand, walk, and drive. Father testified that he is unable to drive without taking Vicodin. (Tr. 15.) In the *Page 2 
magistrate's decision, the court noted, "[t]his court ordered [father] to participate in counseling with his son and he was unable to do so due to his back problems."
 {¶ 9} Mother and father divorced in September 2002 when Matthew was nine months old. The original visitation arrangement ordered mother residential parent, and father was permitted to exercise companionship rights the third week of every month. This arrangement had been in effect since September 2003.
 {¶ 10} While the divorce was pending, mother relocated from East Liverpool to Medina, Ohio. After the divorce, mother relocated from Medina to Dayton, Ohio. Since living in Dayton, mother lived at three different addresses in four years. However, mother resided at the most recent address for two continuous years in a three-bedroom apartment with her five children.
 {¶ 11} Prior to each move, mother filed a notice of intent to relocate with the court, which the court permitted each time. In its decision allowing mother to relocate to Dayton, the court considered the fact that father had indicated to mother "that he would not object to her returning to the Philippines with the minor child as he knows her economic circumstances would improve if she went to the Philippines."
 {¶ 12} Mother initially requested that the court order father to provide all transportation for purposes of companionship due to mother's fear of driving resulting from a car accident she was involved in on the first day she had her driving license. Father eventually requested that the court order mother to share one-half the driving. The court declined to modify the agreements made regarding transportation. The court said that due to mother giving birth to four more children, it was "physically impossible" for her to transport the children to facilitate companionship, and further that a babysitter was too costly. The trial court reduced her child support allocation by $90.00 per month effective July 1, 2006 to cover one-half of father's fuel costs.
 {¶ 13} Companionship exchanges occurred at Erma's House, a family visitation center in Dayton. This was due to a civil protection order in place at the time, but that later expired prior to trial. *Page 3 
 {¶ 14} During the companionship exchanges at Erma's House in September and October 2006, Matthew cried and resisted leaving for companionship with his father. In November 2006, Matthew once again protested leaving Erma's House for companionship. At some point between September and November 2006, Matthew made allegations to his mother that his father hit him with a hammer. (Tr. 58-59, 82.) In November 2006, Erma's House terminated their involvement in the case until a professional counselor met with Matthew and provided an evaluation. Erma's House sent a letter dated November 21, 2006 to father explaining that the "exchange is beyond the scope of our services, as Matthew is showing that he is not emotionally stable to handle exchanging at Erma's House."
 {¶ 15} Mother testified that Matthew met with a counselor named Steve White four or five times after Erma's House terminated the Pazin case. (Tr. 61.) Mother further testified that Matthew saw Dr. Miceli in accordance with the trial court's order. (Tr. 63.) Mother also testified that Dr. Miceli recommended that Matthew and father get counseling together "to get [Matthew] used to his father so [Matthew] won't be crying when * * * he has to go with [father]." (Tr. 73.) The record reveals that these recommended counseling sessions between father and son never occurred. (Tr. 73-74.) The magistrate's decision noted, "[n]o depositions of the counselor the child was seeing in Dayton were presented to this court."
 {¶ 16} The court appointed a Guardian Ad Litem (GAL) for Matthew in April 2003; however, the record does not contain any reports from the GAL, or any depositions or testimony.
 {¶ 17} In December 2006, father filed a motion seeking a new place of exchange due to Erma's House terminating the Pazin case. Father also sought make-up time for missing the November 2006 visitation. In response, mother filed a motion requesting that the court suspend visits until the physical abuse allegation could be resolved and counseling with Matthew could take place. The court ordered that mother take Matthew to counseling with Dr. Joy Miceli on March 12, 2007. *Page 4 
 {¶ 18} In a letter dated April 17, 2007, Dr. Miceli acknowledged meeting with Matthew on March 12. Dr. Miceli stated that another session was necessary for her to complete her evaluation. She also stated that in spite of the fact that she could not make specific recommendations or impressions after her first and only appointment, that "it seems unlikely at this time that Ms. Pazin is directly influencing Matthew's behavior. He presents as a rather strong-willed child who would not be easily led." The record does not contain any other correspondence or reports made by Dr. Miceli.
 {¶ 19} Father filed another motion to modify the transportation arrangements for the companionship exchange, alleging back problems. Also, father submitted a doctor's note that he was not permitted to sit or drive for more than two-hour increments.
 {¶ 20} In May 2007, father filed a motion requesting that the court name him residential parent of Matthew. As grounds, father cited "a change in circumstances" being Matthew's new fall 2007 school schedule. Father also cited that mother made "false allegations" against him, and denied him companionship.
 {¶ 21} Father subsequently filed notice with the court of his intention to depose Dr. Miceli. Shortly thereafter he filed notice that Dr. Miceli's deposition was cancelled.
 {¶ 22} A June 19, 2007 order states that "[t]he Court was advised that the parties were unable to complete counseling as the father's back surgery prevented him from driving to Dayton." The order also stated that Matthew was left with father for the "remainder of the summer until August 17, 2007." This was at the suggestion of mother. The court finally ordered that "father and son shall immediately contact the Counseling Center of Columbiana County to schedule counseling." The record is not clear as to whether this is the location that counseling occurred, but father testified that his first counseling session took place with Georgia Smith — the day before trial. (Tr. 19-20.)
 {¶ 23} The court found that a change of circumstances occurred in the circumstances of both Matthew and mother. Accordingly, the trial court modified the *Page 5 
parenting schedule and named father the primary residential parent and legal custodian of Matthew.
 {¶ 24} After mother objected to the magistrate's decision, the trial court reviewed the record and heard arguments. On October 23, 2007, the court affirmed the magistrate's decision. This appeal followed. Mother raises three assignments of error.
 {¶ 25} Mother's first assignment of error states:
 {¶ 26} "THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION WHEN IT EXCLUDED THE TESTIMONY OF BENJAMIN PAZIN IN REGARDS TO PRIOR ACTS OF DOMESTIC VIOLENCE."
 {¶ 27} Mother asserts that the court should have permitted the testimony of Benjamin Pazin, the adult son of father. The trial court sustained father's objection to Benjamin's testimony, but allowed mother to proffer the testimony for the sake of the court's record. (August 2, 2007 Tr. 90-91.) Mother argues that Benjamin's testimony, combined with Matthew's displays of apprehension prior to visiting his father, and the civil protection order issued against father, "should have been enough to cause the Court to hear the testimony of Benjamin Pazin." Citing R.C. 3109.04(F)(1)(h), mother argues that past acts of domestic violence by a parent is a relevant factor in determining custody. Mother also cites toParrish v. Parrish (2002), 95 Ohio St.3d 1201, 765 N.E.2d 359, asserting that "[c]ourts cannot look at incidents of domestic violence in a vacuum. Domestic violence is almost always a series of incidents that gradually escalate into increasing acts of brutality, repeating themselves in cycles." Id. at 1207, 765 N.E.2d 359.
 {¶ 28} The admission and exclusion of evidence rests within the sound discretion of the trial court. Rigby v. Lake Cty. (1991),58 Ohio St.3d 269, 271, 569 N.E.2d 1056. Abuse of discretion involves more than error in judgment; it implies an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. A reviewing court is prohibited from substituting its judgment for that of the trial *Page 6 
court when applying the abuse of discretion standard. In re Jane Doe1 (1991), 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181; Berk v.Matthews (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301. Finally, an appellate court must presume that trial court determinations are correct, because the trial court is in the best position to view the witnesses and weigh the credibility of the proffered testimony. Jane Doe1, 57 Ohio St.3d at 138, 566 N.E.2d 1181; Bechtol v. Bechtol (1990),49 Ohio St.3d 21, 23, 550 N.E.2d 178; Miller v. Miller (1988),37 Ohio St.3d 71, 74, 523 N.E.2d 846.
 {¶ 29} For evidence to be admissible, it must be relevant. Evid. R. 402. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence in the determination of an action more or less probable. Evid. R. 401.
 {¶ 30} Mother's reliance on Parrish is misguided. The Ohio Supreme Court originally accepted Parrish to decide whether it is an abuse of discretion for a trial court to exclude evidence that the accused abused household or family members other than those actually seeking a civil protection order, not a custody modification proceeding as in this matter. Parrish, 95 Ohio St.3d at 1204, 765 N.E.2d 359, However, the Supreme Court ultimately dismissed the case as having been improvidently allowed. The opinion that mother relies on is that of the dissenting judge, who found that "such evidence should not be excluded." Id. Ohio Supreme Court dissenting opinions may be persuasive, but such opinions are not binding. Addis v. Howell (2000), 137 Ohio App.3d 54, 58,738 N.E.2d 37.
 {¶ 31} R.C. 3109.04(F)(1) states "[i]n determining the best interest of a child pursuant to this section, * * * the court shall consider all relevant factors, including, but not limited to * * * [w]hether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; * * * and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child." R.C. 3109.04(F)(1)(h).
 {¶ 32} R.C. 3109.04(F)(1)(h) does not simply discuss "past acts of domestic violence" as relevant to determining custody, but instead examines whether either *Page 7 
parent has ever been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused or neglected child. According to the record, the father's past acts have not resulted in a conviction or guilty plea. However, the statute also allows courts to examine "all relevant factors," and does not limit the court to those outlined in the statute.
 {¶ 33} In Eitel v. Eitel, the Fourth District Court of Appeals considered an appeal from a divorce decree determination of custody.Eitel v. Eitel (Aug. 23, 1996), 4th Dist. No. 95CA11. The appellant argued that evidence dated earlier than the subject child's birth tended to prove that appellant was the better choice for residential parent for the subject child. The Eitel court held that trial courts conducting custody hearings have not abused their discretion by limiting "admissible evidence of a parent's background and conduct to activities that occurred within a reasonable time immediately preceding the hearing." Also, it found that it was reasonable to limit the evidence to events and circumstances that affected the subject child within their lifetime.
 {¶ 34} Father's argument is reinforced by the court's holding inEitel. Father argues that the trial court correctly excluded the testimony of Benjamin Pazin because they had been estranged since 1995, with the exception of one brief meeting in 2001, and because there was no evidence of domestic violence. Father does not cite to any case law to bolster his argument. In its October 23, 2007 judgment entry, the trial court also found that the magistrate properly excluded the testimony of Benjamin Pazin because the "evidence was dated."
 {¶ 35} In Helms v. Helms (Sept. 10, 1997), 9th Dist. No. 18142, the Ninth Appellate District considered the relevance of testimony relating to the appellant's past history of abuse. In Helms, the appellee sought to introduce evidence of the appellant's history of past abuse in order to prove that she should have been awarded sole residential parent status. At the first stage of trial, the court disallowed all testimony from the wives and children of appellant's first three marriages. The trial court also refused to permit reports from Children's Services Board relative to the first *Page 8 
marriage, which ended in 1978. The court cited irrelevance, and the fact that no children were produced in the second or third marriage, and those ex-wives did not know the children in the present case.
 {¶ 36} At a later stage in trial, under the direction of a new judge, the appellee once again attempted to introduce the same evidence. The appellee actually called the first wife as a witness, but after her testimony began, the appellant objected. The appellee explained to the court that "she thought the testimony was admissible because R.C. 3109.04(F) `talks about a history of abuse as being relevant and pertinent[.]'" The court again disallowed the testimony because of the "age of the relationship."
 {¶ 37} The Helms court said that the appellee "has failed to proffer with any specificity the proposed testimony of [appellant's] former wives and children." Id. Accordingly, the Ninth District found that the record was insufficient to review the exclusion of that evidence and was unable to determine whether the exclusion was prejudicial and an abuse of discretion on the part of the trial court. Thus, the Ninth District overruled the appellee's assignment of error.
 {¶ 38} In contrast, in this case, mother did proffer with specificity the testimony of Benjamin Pazin. Accordingly, the record is sufficient for this court to review and to determine whether the exclusion of evidence was prejudicial and an abuse of discretion on the part of the trial court.
 {¶ 39} Under the circumstances of this case, the trial court did not abuse its discretion in excluding the testimony of Benjamin Pazin in regards to prior acts of domestic violence. Benjamin testified that his relationship with his father was nonexistent for twelve years, with the exception of one brief encounter in 2001. (Tr. 98, 102-103). Benjamin also testified that he never met Matthew. (Tr. 102). Benjamin did testify that his father cussed, exhibited behavior that scared him, and was a verbally abusive individual. (Tr. 95-97, 99-100). However, the trial court reviewed the proffered testimony and still concluded that it was properly excluded because it was dated. The trial court also found that because Benjamin had not seen his father for *Page 9 
such a long period of time, he could not "opine on his father's ability to parent at this point in time."
 {¶ 40} Accordingly, mother's first assignment of error is without merit.
 {¶ 41} Because mother's second and third assignments of error are interrelated, they will be considered together. They state, respectively:
 {¶ 42} "THE TRIAL COURT'S DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 43} "THE TRIAL COURT ERRED AS A MATTER OF LAW AND MADE ITS DECISIONS CONTRARY TO THE EVIDENCE AND ABUSED ITS DISCRETION IN AWARDING CUSTODY OF THE MINOR CHILD TO PLAINTIFF."
 {¶ 44} A trial court has broad discretion in its determination of parental custody rights. Booth v. Booth (1989), 44 Ohio St.3d 142, 144,541 N.E.2d 1028. A trial court's custody determination will therefore not be disturbed unless it involves an abuse of discretion. Bechtol v.Bechtol (1990), 49 Ohio St.3d 21, 23, 550 N.E.2d 178. An abuse of discretion connotes that the trial court's decision was arbitrary, unreasonable, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. The trial court has discretion to do what is equitable upon the facts and circumstances of each child custody case. Booth, supra. As such, a trial court does not abuse its discretion in an award of custody and its decision will not be reversed as against the manifest weight of the evidence when it is supported by a substantial amount of competent and credible evidence.Bechtol, supra.
 {¶ 45} While a trial court's discretion in a custody modification proceeding is broad, it is not absolute and must be guided by the language set forth in R.C. 3109.04. Miller v. Miller (1988),37 Ohio St.3d 71, 74, 523 N.E.2d 846.
 {¶ 46} Three elements must exist in order for the trial court to properly modify residential parent status: (1) there must be an initial threshold showing of a change in circumstances; (2) if circumstances have changed, the modification of custody must be in the children's best interests; and (3) any harm to the children resulting from a *Page 10 
modification of the plan must be outweighed by the advantages of such a modification. R.C. 3109.04(E)(1)(a)(i-iii). The record must support each of these findings or else the modification of child custody is contrary to law. Davis v. Flickinger (1997), 77 Ohio St.3d 415, 417,674 N.E.2d 1159. Additionally, there is a rebuttable presumption that retaining theresidential parent designated by prior decree is in the child's bestinterest. R.C. 3109.04(E)(1)(a).
 {¶ 47} When considering the best interest of a child the court shall consider the following factors:
 {¶ 48} "(a) The wishes of the child's parents regarding the child's care;
 {¶ 49} "(b) If the court has interviewed the child in chambers * * * regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
 {¶ 50} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 51} "(d) The child's adjustment to the child's home, school, and community;
 {¶ 52} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 53} "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
 {¶ 54} "(g) Whether either parent has failed to make all child support payments * * *;
 {¶ 55} "(h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; * * *;
 {¶ 56} "(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
 {¶ 57} "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state." R.C. 3109.04(F)(1). *Page 11 
 {¶ 58} A trial court is also permitted to consider other factors not listed in R.C. 3109.04(F) in making its decision as to the best interests of the child. In re Nentwick, 7th Dist. No. 00 CO 50, 2002-Ohio-1560, at ¶ 43.
 {¶ 59} Mother fails to conduct a change in circumstances analysis, and instead proceeds directly through a best interest analysis. However, father did proceed through a change in circumstances analysis.
 {¶ 60} Father argues that a change in circumstances occurred in that the child is now old enough to attend kindergarten, and that the previously established parenting schedule was no longer appropriate. Father also cites to mother's involvement in her own education and her reliance on Head Start to care for Matthew while she is fulfilling these school obligations.
 {¶ 61} Next, father argues that the modification is in Matthew's best interest pursuant to the court's "line by line" analysis of 3109.04(F)(1)(a-j) in the magistrate's decision. Father relies on the following examples of how the court's decision is in Matthew's best interest: Matthew's "normal" interaction with father; the "extraordinary" amount of time Matthew spends at Head Start; and mother's three moves since her relocation to Dayton. Father also asserts that he does not owe any child support arrearages, and that neither parent has been convicted of domestic violence or abuse or neglect of a child.
 {¶ 62} Additionally, father cites to "major visitation problems" such as an incident where Matthew's doctor prohibited his travel due to an asthma attack. In May 2006 father arrived in Dayton at Erma's House to retrieve Matthew for companionship, but discovered upon his arrival that Matthew had an asthma attack earlier in the day and was under doctor's orders not to travel. In the magistrate's decision, the trial court noted, "[t]he companionship period was made up, however, the lack of communication to prevent the four and one-half hour one way drive and the inability for the plaintiff to see the child once he drove to Dayton shows an interference with this court's orders." Interestingly, the court didn't allow mother to *Page 12 
testify at trial regarding this incident because, according to the court, the incident was resolved at a previous hearing, and the visitation was made up to father. (Tr. 71-72.)
 {¶ 63} Finally, father argues that any harm to Matthew resulting from a custody change is outweighed by the benefits. Thus, father argues, because he is disabled, he is available to Matthew "24/7," which, according to father, is more beneficial than Matthew attending daycare when under mother's care. Father also argues that "[i]n her own words, Appellant stated at trial she has other kids, goes to school and it is too much for her." (Tr. at 60.) However, father asserts that he has "nothing but Matthew to occupy his time." Father also asserts that there is no evidence that he harmed Matthew.
 {¶ 64} In attempting to bolster his argument, father has taken mother's statements out of context. When questioned about signs of physical abuse upon Matthew's return from visitation with father, mother testified as follows:
 {¶ 65} "Q. Okay. Any physical problems when he would return from his father's?
 {¶ 66} "A. Not that I know of.
 {¶ 67} "Q. Okay.
 {¶ 68} "A. I stop writing down every document, because I — I got other kids and I go to school, you know. . .
 {¶ 69} "Q. Okay.
 {¶ 70} "A. So, it's too much for me, you know, to write things." (Tr. 60.)
 {¶ 71} Apparently, father believes the combination of school and other children is "too much" for mother. However, the transcript reveals mother was referring to keeping written documentation of physical problems as being "too much" in combination with her children and school.
 {¶ 72} In support of her argument that the modification is not in the best interest of Matthew, mother argues against the following conclusions of law made by the trial court. In her objection to conclusion of law number two, mother argues that the trial court's opinion that Matthew is "in daycare for what is an extraordinary *Page 13 
amount of time per day" is unreasonable. Mother stated, "[t]his attitude * * * lends deference to and encourages parents not to work or better themselves. It rewards parents who offer their child a life under public assistance and/or working odd jobs."
 {¶ 73} The Fourth Appellate District acknowledged that it may be preferable for a child to be cared for by family rather than daycare. See In re Schwendemen, 4th Dist. No. 05CA18 05CA25, 2006-Ohio-636, at ¶ 59. However, the court found that the trial court did not abuse its discretion in finding that the father's reliance on daycare did not render him an unsuitable parent. Id. The court cautioned that most working parents would be unsuitable if their employment schedules and daycare needs were determining factors of parental suitability. Id.
 {¶ 74} Mother also objects to conclusion of law number 3(c) based on the court's failure to determine how Matthew will be affected upon being separated from his siblings. Mother further objects to the court's conclusion that Matthew's interaction with his father "appears to be normal" despite the fact that he didn't see appellee for seven months. The court concluded that Matthew's reluctance to visit father dissipated when mother was no longer in Matthew's presence. Mother objects to the court's characterization of this situation, and asserts that other factors presented at trial contributed to this issue, such as the fact that Erma's House terminated the Pazin case until Matthew received counseling and the counselor confirmed that Matthew could handle visitation with father. Also, father was court ordered to participate in counseling with Matthew in Dayton, but failed to do so. Mother argues that the court also overlooked an incident that occurred at the courthouse in which the Magistrate herself could not convince Matthew to go to lunch with his father. (Tr. 85-86.) Based on this incident, the trial court declined to conduct an in camera interview with Matthew during the trial proceedings. Id.
 {¶ 75} In mother's objection to conclusion of law 3(d), mother asserts that the court failed to examine the "potential harm" to Matthew in terminating stable relationships with his pediatrician, counselor, and psychologist in Dayton. *Page 14 
 {¶ 76} Mother also objects to conclusion of law number 3(e) in which the court examines the mental and physical health of the parents. The court correctly notes that father has back problems that affect his ability to sit, stand, walk, and drive. However, mother argues that the court failed to address father's testimony that he cannot drive without taking his Vicodin prescription. Mother argues that "[t]he court failed to address the danger that this would cause to a five year old boy, who is totally dependant on his father for transportation." Under conclusion 3(e) the court also acknowledges that mother is free of mental and physical health problems, but that "she has claimed a fear of driving at one point which the court is now of the opinion was not a valid fear but one designed to require the plaintiff/father to do all the driving for companionship." Mother argues that the evidence does not support this conclusion by the court.
 {¶ 77} Finally, mother objects to conclusion of law 3(f) regarding the court's discussion of the seven-month gap in visitation, and Matthew's allegations of abuse by father. Mother claims that the court unreasonably implies that she did not believe Matthew's allegations of abuse. Mother also argues that in the trial court's findings of fact and conclusions of law, the court failed to address evidence presented regarding father's credibility, such as his previous conviction of a crime of dishonesty, being attempted receiving stolen property. Mother points out that there was no evidence presented to refute her credibility.
 {¶ 78} In support of her argument that the trial court's decision is against the manifest weight of the evidence, mother lists her objections to eight different findings of fact contained in the magistrate's decision. Not all of these objections are outlined here, as many contain similar issues to those discussed under mother's objections to the trial court's conclusions of law.
 {¶ 79} Mother objects to several findings of fact on grounds that the court took many of her statements out of context due to English not being her first language. Mother objects to the following findings of fact on this basis. In finding of fact number eleven, the court stated, in part, as follows: "Defendant testified that Matthew told her *Page 15 
that Plaintiff was physically abusing him but that she did not know whether to believe him or not. * * * Defendant subsequently became aware at some point that there was no physical abuse."
 {¶ 80} When questioned about the alleged abuse, mother testified:
 {¶ 81} "Q: Okay. Any physical problems when he would return from his father's?
 {¶ 82} "A: Not that I know of.
 {¶ 83} "Q: Okay.
 {¶ 84} "A: I stop writing down every document, because I — I got other kids and I go to school, you know.
 {¶ 85} "Q: Okay.
 {¶ 86} "A: So, it's too much for me, you know, to write things."
 {¶ 87} "Q. Okay, and it's been a long while-
 {¶ 88} "A. — yeah.
 {¶ 89} "Q. — so, are you saying your memory is not that good?
 {¶ 90} "A. And it's not — it's just that I was thinking there is no — it's not really necessary to write down everything he say, because I tend to rely on what he's saying, you know.
 {¶ 91} "Q. On what Matthew's saying?
 {¶ 92} "A. Yeah, I — I don't know if he's telling the truth, or what you know, I'm not there when he's with his father, I don't know what — how he's been treated.
 {¶ 93} "Q. Okay.
 {¶ 94} "A. And the same thing with his father, when he's with me he doesn't know what, you know . . . what we're doing." (Tr. 60.)
 {¶ 95} Mother objects to this statement in finding of fact number twelve: "She further testified, `You can't rely on what Matthew says.'" The court must have mistakenly quoted mother, as a review of the trial transcript does not reveal this statement. *Page 16 
 {¶ 96} In finding of fact number fourteen, the trial court stated that "the defendant has indicated that her life is too busy to pay particular extra attention to Matthew * * *." Mother refutes this finding as erroneous, arguing that she never testified that she is too busy to pay attention to Matthew, that there is no evidence of neglect, and that the court seems to exhibit bias "against a mother who has other children and is working and attending school."
 {¶ 97} Finally, mother refutes the court's finding in number twenty-eight, which sets forth "defendant's [mother's] only proposal to companionship." Mother "calls into question the judgment of the trial court as a neutral and detached institution" because father failed to offer any proposal for companionship in light of the fact that Matthew would be starting kindergarten. When asked whether mother could offer an alternative to parenting time for father, mother responded as follows: "Well, we just go whatever the, you know, the county requires for a long-time visitation. I don't have any idea. I'm . . . I never have this kind of problem in my life, you know. I'm — I am new to this country, so, I just don't know how it really works, you know." (Tr. 76.)
 {¶ 98} The mother contends that the trial court failed to consider these factors in rendering its decision and erred in designating father as Matthew's residential parent.
 {¶ 99} In the present case, the trial court was required to retain mother as Matthew's residential parent unless it found a change in circumstances had arisen as set out in R.C. 3109.04(E)(1)(a)(i) through (iii) since the last decree and a modification was in Matthew's best interest. The court said "[t]here has been a change of circumstances in that the child is now 5 and 12 [sic] years old and the current parenting schedule must be changed due to the fact that he is entering school. Further the mother's circumstances have changed in that she is now attending school, has four other children, has placed the child in daycare for what is an extraordinary amount of time per day and by her own admissions Matthew does not listen to her and she has insufficient time for him." *Page 17 
 {¶ 100} The magistrate's factual determinations are not fully supported by the record. A glaring example of this is when the magistrate states at finding of fact twelve that mother testified, "You can't rely on what Matthew says." A thorough review of the record reveals no such testimony on the part of mother.
 {¶ 101} Additionally, the record does not support several inferences that the court makes in reference to mother's testimony. Thus, the presumption that retaining mother as the residential parent designated by prior decree is in the child's best interest was not rebutted.
 {¶ 102} A child getting old enough to attend school is by itself insufficient to rebut the presumption contained in R.C. 3109.04(E). Alone, it represents nothing more than the natural progression of time. The magistrate also seemed to place an inordinate amount of emphasis on changes that occurred in mother's life without explaining how they affected or constituted a change in Matthew's circumstances. As for mother attending school, it would be unfair to penalize a parent for furthering their education. It may cut into some of the time mother gets to devote to Matthew, but the record does not reveal any corresponding detriment to him. In contrast, in the long term, it should be viewed as an opportunity for mother to obtain better employment and, perhaps, a better standard of living for her and her family, including Matthew. It likewise would be unfair to characterize the existence of siblings as somehow unbeneficial. The presence of mother's four other children does have corresponding advantages and disadvantages. While they may distract somewhat from the individual time mother can devote to Matthew, he reaps the benefits of having siblings and playmates and the evidence indicates that he has bonded closely with them on an emotional level. He would cry when his twin sisters left for a sleepover. (Tr. 75-76.) In sum, there is scant evidence that Matthew's circumstances had changed measurably or that he had been adversely affected by any of the changed circumstances.
 {¶ 103} The First District Court of Appeal's decision in Rowe v.Franklin (1995), 105 Ohio App.3d 176, 180, 663 N.E.2d 955, provides some guidance. The *Page 18 
First District considered the trial court's determination in a custody modification matter. The Rowe court stated, "[f]rom our review of the record, the trial court's findings of fact and conclusions of law reflect that it abused its discretion not for those specific reasons set forth in the mother's brief, but because we are convinced that the trial court did not consider in its analysis of the child's best interests whether the mother's conduct had a direct adverse impact on the child when it transferred custody and designated the father as custodial parent." Id. at 181, 663 N.E.2d 955. The Rowe court found it significant that the trial court exhibited an "apparent judgmental attitude toward the mother's life choices." Id. The court determined that the record failed to demonstrate how the mother's subsequent relationship, the birth of a new baby, her law school and work schedules, and her reliance on daycare or babysitters, "have had or probably will have a harmful effect on the child." Id. at 186, 663 N.E.2d 955. Thus, the court found that the trial court's findings of fact and conclusions of law manifestly placed a disproportionate emphasis on the mother and her "priorities" and not enough on the best interests of the child. Id.
 {¶ 104} Finally, the magistrate criticized mother because "in her own words does not have the time to devote to Matthew." It is unclear to which part of the trial transcript the court refers. Nowhere does the transcript reflect such a phrase or implication by mother. Mother only seems to express a desire to have more time away from court proceedings, not her child. (Tr. 62, 65-66, 74.) The record seems to demonstrate that mother does indeed make time for her child. Mother testified that she took Matthew to at least two different counselors at different points in time to comply with court orders and help him "get back to normal." (Tr. 63.) Mother testified that she took Matthew to four or five appointments with Steve White, and three or four appointments with Dr. Miceli. (Tr. 61, 63.) Mother also testified that she would continue to take Matthew to counseling if necessary. (Tr. 63.) Mother further testified that Matthew sees his family doctor when he's ill or has an asthma attack. (Tr. 70.) She also testified that she registered Matthew at the local elementary school and that he had an appointment with a doctor to get the shots the school requires. (Tr. 54.) *Page 19 
Mother named Matthew's school friends and his favorite teacher when testifying about Matthew's experience at Head Start. (Tr. 67-68.) In finding of fact number fourteen, the magistrate took exception to the fact that mother couldn't remember the specific date of the doctor appointment scheduled in September. However, the magistrate did not take issue when father could not remember the day or month that he claims he drove to Dayton to see Matthew's counselor, Dr. Miceli. (Tr. 38.) The record seems to demonstrate that in spite of being a mother to her other children, as well as a student, that mother does indeed devote enough time to Matthew to see that his needs are met, and is aware of his interests and other people in his life.
 {¶ 105} It is apparent from review of the record and the foregoing discussion that the magistrate misinterpreted much of mother's testimony, and then that the magistrate and in turn, the trial court, based its decisions upon those misinterpretations. Thus, the record does not support each of the magistrate's findings of fact and conclusions of law.
 {¶ 106} For the foregoing reasons, mother's second and third assignments of error have merit.
 {¶ 107} The judgment of the trial court is hereby reversed and the original custody order designating appellant as residential parent is reinstated. *Page 1