[Cite as *In re O.L.G.C.*, 2020-Ohio-4981.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

|  |  |  |
|---|---|---|
|  | : |  |
| IN THE MATTER OF: | : | CASE NO. 19CA19 |
| O.L.G.C. | : | DECISION & JUDGMENT ENTRY |
| A Minor Child. | : |  |

APPEARANCES:

Susan Gwinn, Athens, Ohio, for Appellant[1].

Nancy Brum, Marietta, Ohio, for Appellee.

CIVIL CASE FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED: 10-8-20
PER CURAIM.

{¶ 1} This is an appeal from a Washington County Common Pleas Court, Juvenile Division, judgment that awarded custody of O.L.G.C., born June 15, 2018, to Courtney Feather, appellee. Jim Caldwell, appellant, assigns one error for review:

ASSIGNMENT OF ERROR:

"AN ADJUDICATION GRANTING CUSTODY TO THE
MOTHER INSTEAD OF THE FATHER SHOULD BE SET
ASIDE WHERE THE EVIDENCE DOES NOT SHOW IT TO BE
IN THE CHILD'S BEST INTEREST."

{¶ 2} This case involves a custody dispute between the child's mother, Courtney Feather

---

[1] Different counsel represented appellant during the trial court proceedings.

(appellee herein), and father, Jim Caldwell (appellant herein).    On June 15, 2018, O.L.G.C. was born to the parties while they cohabitated.    On November 26, 2018, both parties filed complaints and sought custody of the child.    A few days later, the trial court awarded appellant temporary custody and granted appellee supervised visitation.    On December 27, 2018, appellee filed a motion to modify the temporary orders and requested the court designate her temporary legal custodian.

{¶ 3} On January 3, 2019, the trial court held a temporary orders hearing.    At the hearing, Washington County Children Services (WCCS) Case Worker Lisa Ball testified that she connects families to services and resources.    Ball received a call on October 24, 2018, "more or less requesting help, services, advice, recommendations."    Ball summarized examples of verbal, mental, and emotional abuse, and testified about concerns regarding appellant "getting in the baby's face, screaming, cussing at the child. * * * [t]here was a concern that he [appellant] did pick the child up and shook the child when he was screaming at the child."    Ball spoke with law enforcement, who visited the home to check on the child, but did not see any signs of abuse. Ball acknowledged that she advised appellee to contact law enforcement, who could get appellee into a shelter or otherwise "out of the situation" until her mother arrived.    Ball testified that she spoke with appellee 16 times while she stayed in Pennsylvania.

{¶ 4} Appellee testified that around Thanksgiving 2018, she left appellant and lived at a shelter.    She acknowledged that she struggled with alcohol, including a 2015 OVI.    Appellee also committed a second OVI in 2017 and is serving non-reporting probation.    Appellee explained that she lost her driver's license, but could get it reinstated within a month.    She also related that she had custody of S.R., her first child, until 2016 when S.R. was about six years old.

The child now lives in Steubenville with appellee's ex-husband.

{¶ 5} Appellee testified that she contacted WCCS on October 24, 2018, when appellant called their child a "'F'ing retard.'" Appellee stated that appellant also said, "'What the F is the matter with you,'" and "'[O.L.G.C.], mommy is going to permanently disappear. Mommy's going on a permanent F'ing vacation,' screaming at the top of his lungs. I was hysterical. I didn't know what else to do."

{¶ 6} Appellant testified that he and appellee began to date in January 2017. Appellant taught for the Department of Corrections until he "took a disability * * * because of my nerves in 2001 because of an incident that happened to me in the * * * prison." Appellant explained that he now receives disability retirement benefits, based on his diagnosis of anxiety disorder, and takes prescription Xanax and Zoloft. Appellant visited the emergency room on August 13, 2018 for a panic attack.

{¶ 7} Appellant also testified that on November 24, 2018, he contacted WCCS to ask about the child's emergency custody when Caseworker Ball informed him that "allegations have been leveled toward you." Appellant related that on November 27, an officer visited his home and informed him of an investigation into appellee's rape allegation. When questioned about the allegation against appellant, appellee stated that it was true, and she made the claim to show a "chain of abuse."

{¶ 8} On cross-examination, counsel asked appellant about Thanksgiving Day 2018. Appellant told appellee she should not go shopping because he suspected she wanted to leave the house to drink. Appellee asked him, in front of others rather than in private, and because his "niece is a felon and * * * her boyfriend is a registered sex offender and it was raining out and I

did not want [appellee] to leave." Appellant also frequently gave nonresponsive answers and attempted to testify to hearsay. The transcript reveals that the magistrate repeatedly admonished appellant to answer only the question asked, and, at times, appellant's attorney also appeared to struggle to reign him in.

{¶ 9} Doris Feather, appellee's mother, lives in Altoona, Pennsylvania and is a retired hospice nurse. Feather testified that she stayed with the parties in their home one to two weeks every month after the child's birth and witnessed appellant verbally abuse appellee. In addition, Feather stated that she witnessed appellant yell at the child, saying, "'You know when I'm trying to sleep that's when you want to cry' [and] * * * he called her 'You F'ing retarded' * * * 'That's all you do is cry.'" Feather did testify that appellee had alcohol issues in the past, and had lost her license as a result of an OVI, but that she did not currently drink.

{¶ 10} Michael Randazzo, appellee's ex-husband and S.R.'s father, testified that he and appellee divorced when S.R. was two years old, and that appellee had full custody until S.R. was six. Randazzo, who lives in Steubenville, obtained custody of S.R. in 2017 after concerns about appellee's drinking. Randazzo cited a March 2015 incident when school staff noticed appellee's intoxication at parent pick-up and called police, who cited appellee for OVI. Randazzo also testified about false allegations appellee made against him concerning inappropriate touching of his daughter, which he believed appellee did to intimidate him and to allow appellee unsupervised visitation. Randazzo stated that he did not believe that appellee ever harmed S.R.

{¶ 11} On January 4, 2019, the magistrate determined that it was in the child's best interest to remain in appellant's temporary custody, subject to appellee's supervised visitation. On January 22, 2019, the magistrate denied appellant's motion to reconsider the supervised

visitation order.   On January 24, 2019, appellant filed a motion to stay visitation until further hearing, but the magistrate denied the motion to stay visitation and stated "the Court would entertain a joint motion from the parties removing the supervision requirement from further visitation."

{¶ 12} At the March 26 and 27, 2019 custody hearing, appellant testified that he was diagnosed with anxiety disorder in 2000, and started to take Xanax and Zoloft.   Appellant also began counseling, which he has attended "on and off."   Appellant stated that other than anxiety and a minor issue with his esophagus, he has no medical problems that interfere with his ability to care for the child.

{¶ 13} Appellant also testified that his mother and sister, along with a retired teacher and a nurse, have helped to care for the child since appellee left.   Appellant stated that the child "sometimes" stays overnight with his mother and sister.   Appellant explained that he jointly owns a stock trading company and, when asked how many hours per week he works, appellant said, "zero."   When asked why he needs daycare when he does not work, he responded, "[because] I'm working on a case," which appears to refer to his legal dispute with appellee.

{¶ 14} Appellant described messages he received from appellee, that he characterized as "death threats," that continued until a day or two before the hearing.   Appellant explained that he used appellee's old phone to "watch her activities" on Facebook and that appellee wrote on FB that her father threatened to kill appellant.   Appellant said that he moved the child to his mother's home for safety concerns.

{¶ 15} Appellant testified that each time he took the child to the Visitation Center, he also sent along a diaper bag.   Each time the bag returned with the child, until February 14 when, he

alleged, appellee "stole" the bag.   Appellant testified that he filed a police report and, when he complained to the Visitation Center, appellee's visitation was suspended for a month during the ensuing investigation.   Appellant later acknowledged on cross-examination, however, that appellee actually owned the diaper bag and that it belonged to her before they met.

{¶ 16} Appellant further testified to concerns with appellee's poor judgment and drinking, and stated that the rape allegation caused some of his behavior toward appellee. Appellant also maintained that (1) appellee did not properly administer the child's acid reflux medication on a weekend visit; and (2) the child might have had scratches on her face during one of the exchanges at the police department.

{¶ 17} When asked how many times he called appellee "a piece of sh*t" in January and February 2019, appellant responded, "Hmmm... I wouldn't tell you.   Since I've been accused of rape."   Appellant acknowledged that he also told appellee that he loved her during the same period, but could not recall how many times he made either statement.   Appellant also acknowledged that, six days after he filed a police report and alleged that appellee stole her own diaper bag, he sent appellee a video while holding their daughter in his lap mouthing "I love you" to appellee.   Appellant admitted on cross-examination that one day he sent fifteen texts to appellee between 10:07 p.m. and 10:53 p.m.

{¶ 18} Appellant    further    explained    that    he    registered    a    domain    called CourtneyFeather.com because he "just wanted to own it."   When the magistrate asked appellant to elaborate on why he would register such a domain, appellant stated:

> I'm pretty upset about the rape.   I'm pretty upset about the rape allegation. * * * I
> have proof that it never happened.   And [appellee] was willing to go after my life,
> and my very freedom over [O.L.G.C.], over a lie.   A lie that I can prove beyond a

shadow of a doubt now. * * * I had told myself, I was going to make a decision, whether I wanted to warn others. That's what I was doing. And I made no decision and nothing ever happened.

{¶ 19} Appellant's mother, Arlene Caldwell (age 81), testified that she lives with her daughter, Patricia Landsittel, in a two-bedroom condominium. Caldwell stated that appellant has a loving relationship with the child and has good parenting skills. Caldwell explained that the child has "been [at her home] since she was six months [old] * * * back and forth." Caldwell also testified that the child spends the majority of her days and nights at her home, with appellant sleeping there "a couple nights a week," and weekends.

{¶ 20} Patricia Landsittel, appellant's sister (age 63), testified that she has systemic lupus and lives with her mother. Landsittel explained that the child sleeps in a "Pack N Play" at their home and that Landsittel helped administer the child's medication. Between January and the hearing date, Landsittel testified that the child had spent more nights at her home than at her father's home, and appellant spends the night at their home "quite a bit." Landsittel also stated that the child spent time at their home because of "safety concerns" that appellee "had made threats to Jim."

{¶ 21} Doris Feather, appellee's mother, lives in Altoona, Pennsylvania near nine brothers and sisters and 40 family members. Feather reiterated that she attended the child's birth and immediately after the birth stayed with the parties in their spare bedroom for two weeks each month. Feather testified that when appellant interacted with the child, "[h]e was very harsh, spoke - he didn't speak. Hollered. Screamed. Because he didn't like her crying. * * * If she didn't take the bottle right away the way he wanted, he would hit her in the side of the face with it, like to get her to take it the way he wanted her to take it." Feather testified that in the fall of

2018, she heard the child begin to cry and appellant said, "you always know when I'm trying to sleep, you start to cry * * * what are you, an F-ing retard?"  Feather also testified that appellant "said to [O.L.G.C.], * * * your Mommy is going to disappear.  She's going on a permanent vacation."

{¶ 22} Feather testified that in late November 2018, she contacted police and drove to Ohio to retrieve appellee because:

> [Appellant] had been very abusive towards her, and she was at her wit's end, crying.  I can't do this anymore.  I'm so scared, Mom.  I'm so scared.  She wasn't sleeping because he wouldn't allow her to sleep.  He would be texting her, texting whatever.  And she was actually secluding herself in the room with the baby.  So knowing Jim and the way he acts, his rage, I felt that it was better if I had an officer there with me so that I could get her out, her and the baby out safely.  [But appellant] grabbed on to the baby [and would not] let her go.

{¶ 23} Feather also testified that appellant frequently texted her, but she chose not to interact "because he just goes on and on, and on and on, you know, one text message can turn into fifty text messages within an hour.  And none of it would make any sense.  You wouldn't get any conclusions."  Feather stated that when appellee had custody of the child, appellant constantly texted, sought attention and interrupted appellee's time with the child.  Feather described it as "total harassment."

{¶ 24} Feather also testified to receiving multiple texts from appellant that referred to Feather's ex-husband, appellee's father.  "He was getting in touch with the Harrison County * * * Sheriff's Department, to have them serve her Father with an eviction notice from his home during the weekend when the baby was present."  Feather explained that appellant told her he had 24-hour surveillance on her ex-husband's home and "was going to have the house watched

while we were there.  And honestly, we did see him, during our visits in Cadiz, he had passed the house."  Feather stated that during appellee's parenting time at her father's home, "one day I know he went by three times," which appellant disputed.

{¶ 25} Feather opined that appellant uses "that baby as a weapon against Courtney." Feather stated that while at the February 8, 2019 visitation exchange, appellant forced appellee to "text him something or he wasn't going to hand the baby over."  Feather stated that appellant told her, "you know, she falsely accused me of rape, and she's going to jail for two and a half years for that, I can guarantee."  Feather claimed that often the child arrived at the visitation exchange with a dirty face, long fingernails, and a general unkempt look.

{¶ 26} Feather also testified that appellant constantly tried to cast appellee in a negative light.  For example, on January 13, 2019 appellant accused her of over-medicating the child, which she adamantly denied and noted that as nurses, she and appellee can capably administer medication.  Feather also stated that she has a four-bedroom home in Pennsylvania, does not drink, has no alcohol in her house, and has not seen appellee drink alcohol while at her home.

{¶ 27} Mike Randazzo, father of S.R. and appellee's first child, testified that he filed an ex parte motion in Jefferson County and sought sole custody "after reading * * * Mr. Caldwell's Ex-Parte down here."  Randazzo researched the Washington County order after appellant contacted him to "let me know that he would no longer be doing pickup and drop off for [S.R.]." Randazzo stated that he has had "some concerns" in the past about appellee's drinking, and explained that, once during visitation, S.R. called four times from appellee's home to tell Randazzo that "she couldn't wake her [appellee] up."

{¶ 28} Appellee testified that she is a Registered Nurse, has an active nursing license, a

degree in Early Childhood Education, and lives with her mother in Altoona, Pennsylvania. Appellee testified after her January 2017 OVI, she attended counseling and submitted multiple drug and alcohol tests as ordered. She also currently attends counseling and takes Zoloft for anxiety. Appellee has a valid driver's license.

{¶ 29} Appellee discussed the allegation that in 2016 her first child, S.R., contacted appellee's ex-husband four times to tell him that she could not wake appellee. Appellee explained that in 2016, she had a head injury with severe concussion. A neurologist prescribed medication and "I wasn't well enough, I should not have been taking care of [S.R.]."

{¶ 30} Appellee also testified that in November 2017, she visited an emergency room "[b]ecause I had been assaulted. There had been horrific fighting and badgering, and the officer there * * * encouraged me to * * * get away from him." Appellee explained that after her hospital discharge, she visited her mother in Wintersville, Ohio [to stay at her father's house] for about three weeks before she attempted to reconcile with appellant because "I genuinely loved Mr. Caldwell. And I found out I was pregnant."

{¶ 31} Appellee explained that on February 15, 2019, a Visitation Center staff member told her that appellant claimed that she had stolen his diaper bag and that if she "didn't return it by noon, there was going to be a warrant issued for my arrest." Because appellee had already returned to Pennsylvania, appellee called Marietta Police and left a message, but nothing came of it. With regard to tainted medication, appellee testified that appellant gave her the child's medication when she picked her up for visitation, but when opened it appeared to be contaminated. She decided to use a bottle that she already had.

{¶ 32} During the hearing, appellee also referred to appellant's incessant text messaging

that alternated between vitriolic and loving. Appellee explained that she owned a pink cell phone that she left at appellant's house and did not give appellant permission to access content on the phone.

{¶ 33} Appellee also read a series of messages from appellant that accused appellee of stealing the diaper bag, and stated she was "playing a life-changing hand of Poker with me * * * that you'll lose," interspersed with "I love you's." Appellee read another exchange in which appellant texted her multiple times and told her "it's an emergency." Appellee responded with suggestions, but appellant demanded she call him and stated, "You're a heartless, cold person, Courtney. I hope you're happy. I need your help and I f**cking pass. You're pathetic."

{¶ 34} Appellee responded:

Yes. I love her with all of my heart and soul, but I'm not letting you use her as a tool to get to me. I'm more than cooperative, happy to help, but you won't ask because it's not what you want. I answered all questions you could have. If it's a true emergency, you should stop being negligent and take her to the ER. Please let me know if you are, or do.

{¶ 35} Appellant responded:

Forget it Court. Find a new life. All right. All I wanted to do was talk to you about (O.L.G.C.). (O.L.G.C.) is fine. I just wanted to talk to you, but that went downhill fast. I pity you.

{¶ 36} Appellee testified that appellant sent messages to her via Facebook Messenger, Whatsapp, and regular text message. "It became exhausting." In February 2019, appellant told appellee that if she relinquished custody and agreed to his terms, he would not testify against her regarding appellee's child S.R.:

He wanted me to come home. He said that he didn't really want to go to Jefferson County, and basically, the deal he wanted me to agree to was, if I sign over my parental rights to [O.L.G.C.], to him, then he had found a camper, and he was

going to purchase it * * * [and] he would park it in the property next to the house * * * and I could accept a job at Marietta Memorial, and I could help him financially, and I may get to see, you know, no guarantees. But I might get to see [O.L.G.C.] you know, every other day, daily, depending on what his plans were, and needs. And eventually, with good behavior, I could work my way back in to living in a home.

{¶ 37} Appellee acknowledged that she had a conversation with appellant and conceded that the rape did not occur, but stated that she told him that "[b]ecause it's impossible to argue with him, and also he said that - you know, he's going for the jugular, going for blood, that he wanted to hear it. He would cut communication if I didn't."

{¶ 38} Appellee further described a March 10, 2019 visitation exchange at the Marietta Police Department when appellant mentioned "CourtneyFeather.com," and led appellee to believe that "[i]t was going to be a tell-all. He was going to expose what a horrible person I am." When appellee returned to Altoona, she obsessed over checking the domain because she feared what appellant might post, and because he had taken so many unflattering photos of her and had told her on numerous occasions, "I will ruin your life." Appellee explained that she hoped to live and work in Pennsylvania because "there's more opportunity and family support."

{¶ 39} On March 29, 2019, the magistrate modified all previous orders regarding parenting time to allow unsupervised week-to-week visitation, and alternated weeks of parenting time with exchanges at the Marietta Police Department. On April 19, 2019, appellee filed a motion to suspend appellant's visitation "as there has been a Temporary Protection from Abuse Order out of the Court of Common Pleas Blair County, Pennsylvania." On May 6, 2019, the magistrate in the case at bar denied the motion to terminate visitation, and noted the ex parte nature of the Pennsylvania order.

{¶ 40} On May 10, 2019, appellant filed a motion for a show-cause order for the failure to comply with a court order, a request for hearing, and a motion to modify the visitation order. Regarding the motion for contempt, appellant asserted that appellee did not present the child for exchange at the Marietta Police Department on May 5, 2019 as ordered, and "refuses to permit the Father to exercise his parenting time in violation of this Court's order of March 29, 2019." Concerning the motion to modify his prior visitation order, appellant stated that he appeared in Pennsylvania on May 9, 2019 for a hearing on the Temporary Protection Order, but appellee appeared without counsel. The court continued the matter, but also allowed the child to return to Ohio with appellant. Appellant's motion sought to terminate the week-to-week visitation and require supervision for appellee's visitation with the child.

{¶ 41} On May 31, 2019, the magistrate issued a decision to award custody to appellee and grant parenting time to appellant per the court's standard parenting-time policy. Also, on May 31, 2019, the trial court approved and adopted the magistrate's decision. However, on June 14, 2019 appellant filed his "Objection to Magistrate's Decision Post-Judgment and Request for Transcript." On July 30, 2019, the trial court (1) overruled appellant's objections, and (2) adopted and reaffirmed the magistrate's decision and the court's May 31, 2019 judgment. This appeal followed.

{¶ 42} In his sole assignment of error, appellant asserts that the custody award should be set aside because the evidence does not show it to be in the child's best interest.

{¶ 43} This case involves a contentious, and sometimes caustic, relationship between appellant and appellee, the child's biological parents. After the breakdown of their relationship, the Juvenile Court had the difficult and unenviable task to attempt to determine the child's best

interest with regard to parental custodial rights. "[C]ustody issues are some of the most difficult and agonizing decisions a trial judge must make. Therefore, a trial judge must have wide latitude in considering all the evidence before him or her—including many of the factors in this case—and such a decision must not be reversed absent an abuse of discretion." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997), citing *Miller v. Miller,* 37 Ohio St.3d 71, 523 N.E.2d 846 (1988). The Supreme Court of Ohio has explained:

> The reason for this standard of review is that the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page.
>
> * * *
>
> This is even more crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well.
>
> *Davis,* 77 Ohio St.3d 415, at 418-419.

{¶ 44} When a trial court must determine the allocation of parental rights and responsibilities, the court must consider the child's best interest. R.C. 3109.04(B)(1). R.C. 3109.04(F)(1) provides the framework for analysis and states that in determining a child's best interest, a court must "consider all relevant factors, including, but not limited to" the following:

> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code ora sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶ 45} In the case at bar, after our review of the record we conclude that the evidence adduced at the hearing supports the trial court's designation of appellee as the child's residential parent.   Thus, we do not believe that the court's judgment constitutes an abuse of discretion.

{¶ 46} Appellant contends that, although the magistrate's decision considered the R.C. 3109.04(F)(1) factors, "there is no genuine analysis of these factors and how they are weighed in relationship to each other." Appellant observes that the only factors relevant to this case are (e)(f)(i)(j) and (k).[2]

{¶ 47} With respect to R.C. 3109.04(F)(1)(e)(the mental and physical health of all persons involved in the situation), the magistrate concluded, "The mother accused the father of rape and the father accused the mother of theft, neither of which turned out to be true which shows some mental instability or poor judgment. Although both parties currently take medication for mental issues, the father is disabled as a result of his mental issues whereas the mother is not. This factor balances in favor of the mother."

{¶ 48} Appellant argues that appellee's two OVI convictions, and her .22 blood alcohol concentration during an emergency room visit, in which she contended that appellant poured alcohol down her throat, tip the scales in favor of appellant on this factor. Moreover, appellant asserts that his disability due to anxiety does not weigh in favor of appellee.

{¶ 49} Our review of the record reveals that although appellee's issues with alcohol have been an ongoing concern, resulted in criminal convictions and affected her custodial relationship with both of her children, appellee's recent history indicates that her situation has improved. Also, both parties take prescription medicines for anxiety and/or depression, but appellant's anxiety disorder is severe enough to support his disability retirement due to panic attacks.

---

[2] [(k) actually is not established in the statute, but the magistrate referred to (k) to encompass "non-enumerated factors."].

During the hearing, appellant testified that although he takes medication for this disorder, he attended counseling "on and off." Concerning the health of others involved, the record reveals that in appellant's support network, his mother is in her eighties and his sister has systemic lupus. While we recognize that this situation is obviously less than desirable as it relates to both parties, we believe that the record supports the magistrate's finding that this factor balanced in favor of appellee.

{¶ 50} With regard to R.C. 3109.04(F)(1)(f) (the parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights), the magistrate concluded that "despite some disputes and issues, both parties have followed the Court's order. This balances evenly between the parties." Appellant, however, points out that appellee falsely accused appellant of rape in order to sever his relationship with the child. Obviously, this allegation is alarming. The record also shows that appellee gave conflicting testimony about the allegation. The trial court also noted, however, that appellant alleged a false theft offense charge against appellee. Apparently, appellant's false claim resulted in a criminal complaint against appellee. The Marietta Law Director's Office later dismissed the complaint, however, and noted that "[i]t is not the role of the Marietta Law Director's Office to become pawns in child custody disputes between warring parties, and particularly where the allegations as to ownership of property made at the time of the police report are contrary to later sworn statements."

{¶ 51} We further observe that appellee filed a motion to terminate appellant's visitation due to a Pennsylvania protection order. The Pennsylvania court later dismissed this protection order and stated:

> The request for a continuation of the temporary Protection from Abuse Order is hereby denied with the Court recognizing that although there is no basis for the continuation of the PFA, this Court clearly understands that this is a high hostility custody matter and will continue to be so until and unless both parties are able to personally get therapy that assists them for their lack of emotional stability.

{¶ 52} Similarly, our review of the record reveals that, unfortunately, both parties have engaged in immature and unscrupulous behavior. Thus, the record supports the magistrate's finding that this factor balanced out between the parties.

{¶ 53} With respect to R.C. 3109.04(F)(i)(whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court), the magistrate concluded that neither party presented evidence that either the mother or the father refused parenting time to the other parent. Thus, the magistrate concluded that this factor balanced out between the parties.

{¶ 54} Appellant, however, argues that the Pennsylvania civil protection order, combined with the move to Pennsylvania, is strong evidence of a mother who will not facilitate visitation. Again, as we note above, neither party in this matter has clean hands. The juvenile court sits in the best position to evaluate witness demeanor and to assess the credibility. *Davis*, *supra,* 77 Ohio St.3d at 418. Moreover, it appears that appellee moved to Pennsylvania to be closer to her mother and significant extended family, as well to bolster job opportunities, rather than to impede appellant's visitation.

{¶ 55} Concerning R.C. 3109.04(F)(j) (whether either parent has established a residence, or is planning to establish a residence, outside this state), the magistrate noted that appellant resides in Ohio while appellee "plans to move the child to Pennsylvania. This factor balances in

favor of the father." Appellant contends that because Altoona, Pennsylvania is five hours by car, appellee's move essentially strips him of the ability to have a "real relationship with his daughter."

{¶ 56} A trial court may consider nonresidence in determining a child's best interests, R.C. 3109.04(F)(1)(j), but nonresidence alone should not deprive a parent of custody. *Marshall v. Marshall,* 117 Ohio App.3d. 182, 187, 690 N.E.2d 68 (3d Dist.1997), citing *In re Marriage of Barber*, 8 Ohio App.3d 372, 375, 457 N.E.2d 360 (8th Dist.1993); *Rowe v. Franklin*, 105 Ohio App.3d 176, 184, 663 N.E.2d 955 (1st Dist.1995). As indicated above, although appellee's move to Pennsylvania makes visitation more challenging, this factor alone should not decide the custody determination.

{¶ 57} Finally, with respect to non-enumerated factors, the magistrate determined:

The biggest non-enumerated factor is where the child has been living while in the custody of the father. By multiple witness' statements, the child spends the majority of her time with the paternal grandmother and paternal sister; the father only spends some of the time with the child.

The mother, on the other hand, spends most of her time with the child when she

has custody. This factor weighs heavily in favor of the mother.

{¶ 58} Appellant argues that because the paternal grandmother and aunt are suitable, it should make no difference that appellant shares time with his family. Although we agree that the record does not reflect a concern with the suitability of the paternal grandmother or aunt, the magistrate instead appears to be concerned with the amount of time appellant leaves the child with family members while he engages in other activities. In addition to the fact that the child did not appear to spend much time with appellant during his time with her, the magistrate's

findings of fact also refer to appellant's purchase of the domain, "CourtneyFeather.com", 17 days before trial, because he "wanted to own it."   Appellant insisted, however, he was not sure what he wanted to do with the domain name, but reiterated he "just wanted to own it."   After being pressed, appellant stated that the rape allegation upset him and he wanted to create a site to warn others about the mother, but ultimately decided not to do so.

{¶ 59} The magistrate also highlighted the maternal grandmother's testimony that she witnessed appellant

> screaming at the child because of her crying and smacking the baby in the cheek with a bottle when she refused to eat.  She stated she heard the father one time state 'you (the child) always know when I'm trying to sleep and start to cry, are you a f**cking retard?'  She also heard the father tell the child 'your mommy is going to disappear.

Moreover, the magistrate observed, "Since January of 2018, she [appellee] receives between three and 150 text messages per day from the father, some calling her names or a 'low-life,' others professing his love for her.   When she would ignore his texts, they would become worse." As an example, Exhibit 1 shows 15 hostile text messages between 10:07 p.m. and 10:53 p.m. on January 23, 2019.  Appellee also testified about appellant's manufacture of a false emergency regarding the child in an attempt to "talk to" appellant.  It is apparent that appellant's text messages exhibit a high level of manipulation.  Although appellant directed these controlling tactics at appellee rather than the minor child, it is not unreasonable for the trial court to find this behavior relevant.

{¶ 60} We, like the trial court, recognize that clearly, appellee has a history of alcoholism, including two OVI convictions.  This is, without a doubt, very concerning, raises questions

about appellee's ability to remain sober and questions about appellee's ability to parent her child. The trial court, however, acknowledged that appellee had "a drinking problem in the past," but showed a valid driver's license as of March 8, 2019 and an active RN license in Pennsylvania that "allows her to seek employment." The magistrate stated, "The mother acknowledged that she is subject to drug tests as a result of an OVI conviction in January of 2017. All of her drug tests were clean except for testing positive for Zoloft, within her prescribed, therapeutic levels." In addition, appellee completed outpatient treatment and appears to have a robust support system in her mother and multiple nearby relatives, such that we cannot conclude that her former alcohol dependency rendered her unable to provide an adequate home for the child now, or in the foreseeable future.

{¶ 61} As is often the case with custody matters, emotions run high and vitriol often results from the toxic mix of he-said, she-said. This case is no different. The parties' tumultuous relationship and their allegations against each other are troubling. While the parties' conduct towards each other certainly leaves much to be desired, it does appear that both parties love the child and that the child, herself, is well-cared for. Here, the applicable standard of review requires this court to give deference to the trial court's resolution of the issues and to the "determination between competing considerations." *Huffman v. Hair Surgeon, Inc.,* 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). Thus, when some competent, credible evidence supports a custody award, an appellate court should not reverse that award as being against the weight of the evidence. *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 23, 550 N.E.2d 178 (1990). Once again, our review of the record reveals ample evidence to support the trial court's judgment. Although the members of this court may have arrived at a different conclusion than the trial court, this

court must nevertheless give the trial court deference in considering the evidence and arriving at a decision. *Flickinger, supra.* Here, neither party appears to be an ideal parent. Instead, the parties have engaged in incessant bickering and should, as the Pennsylvania court recommended, seek counseling for their lack of emotional stability. At some point, the child's interest should be paramount and both parties should act accordingly.

{¶ 62} Therefore, after our review we conclude that the trial court's judgment does not constitute an abuse of discretion. The trial court analyzed all relevant factors, including R.C. 3109.04(F)(1), and determined that appellee's designation as legal custodian is in the child's best interest.

{¶ 63} Accordingly, based upon the foregoing reasons, we overrule appellant's assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court, Juvenile Division, to carry these judgments into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J., Abele, J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Jason P. Smith, Presiding Judge

BY:_____
Peter B. Abele, Judge

BY:_____
Michael D. Hess, Judge

## NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.